**Adele MARTIN, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 6665.**

Court of Appeals of Alaska.

June 10, 1983.

A. Lee Petersen, Anchorage, for appellant.

W.H. Hawley, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

Adele Martin was convicted of murder in the first degree, AS 11.41.100. She received the minimum twenty-year sentence. She appeals arguing that the court improperly instructed the jury, erred in denying her motion for judgment of acquittal, and erred in denying a motion for mistrial. Martin also contends that the minimum twenty-year sentence for first-degree murder is unconstitutional. We affirm.

Adele Martin shot and killed Clyde Paustian, a man with whom she had lived for

approximately ten years at the time of the shooting. During November 1980, Paustian indicated that he was dissatisfied with their relationship. Nevertheless, for the next four months they continued to reside together, often bickering about their relationship. During that time Martin contemplated suicide. Ultimately it occurred to Martin that Paustian was seeing another woman, and approximately one week before the shooting, Martin discovered who she was. In conversations with friends she discussed destroying Paustian's possessions, and shooting him or the other woman. Martin confronted Paustian with her concerns and was dissatisfied with his responses. In her brief she described what happened thereafter as follows:

> [Martin] went and got her gun and shot him. He had just bent over the sink to wash his hands and he looked at her in terror and cried out and she was horrified with herself. He turned toward her and she pulled the trigger again. He fell sideways and grabbed the door. She was terrified and backed away, wanting to run. She thought she should run away from him, because he would kill her and the door flew open and she heard noise. He was staggering and motioned toward the gun and she pulled the trigger again. His face went blank and he lay down. He just lay down in front of her with a big sigh and stretched out and his elbows came up once. She was terrified, thinking he would get up and kill her, but he didn't. A gurgling noise came in his throat and she was sorry she had done it. She didn't even know why she had done it. She thought he was strangling to death and she said his name and cried a little and then put the gun to his head twice and shot him in the head.

Martin stated that she was "in a rage" when she shot Paustian.

Martin's trial strategy centered on proving diminished capacity.[1] Dr. Ronald Ohlson, a clinical psychologist, administered the Minnesota Multiphasic Personality Inventory to Martin. He testified that the test showed her to have a marked degree of psychological disturbance. The test profile also showed that Martin was very shy, quiet, withdrawn and anxious. Dr. Ohlson stated that the test gave indications that Martin was chronically depressed.

Dr. Ohlson interviewed Martin for five hours. He testified that Martin felt her whole world stopped after Paustian told her that he did not want anything to do with her. He stated that before getting the gun, Martin felt utterly helpless, alone, hopeless, and extremely confused. He related:

> At that point she had no idea where she was going or what she was going to do. And it seemed like to her that her whole world had come to an end. Had stopped at that moment. At that point she went in the other room, feeling nothing, picked up the gun, went back and—and shot him.

Dr. Ohlson also said Martin did not seem to be thinking clearly after the shooting. Dr. Ohlson believed that at the time she shot Paustian, Martin was suffering from a form of depression known as dysthymic reaction, was irrational, and could not really appreciate the wrongfulness of what she was doing. Based on the difficulty he had reading transcripts of Martin's interviews with the police because of her incoherent sentences and based on his difficulty in following her thinking, Dr. Ohlson concluded that Martin was "borderline mentally ill." He stated that the psychological term mental illness coincides to a great extent with the legal term "insanity." He concluded by stating that Martin "fits more under the concept of the depressive neurosis with the deteriorated ability to think," rather than in the class of mental illness. Dr. Ohlson conceded that

1. Former AS 12.45.085 read as follows:

   *Evidence of mental disease or defect.* Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense. However, evi-

   dence of mental disease or defect excluding responsibility is not admissible unless the defendant, at the time of entering his plea of not guilty or within 10 days thereafter or at such later time as the court may for good cause permit, files a written notice of his intent to rely on that defense.

Martin's actions after the killing were to a certain extent logical and that she was motivated to shoot Paustian to end his relationship with his paramour.

Dr. Aron S. Wolf, a psychiatrist, also testified on behalf of Martin. He described Martin as extremely depressed at the time of the murder. He stated that Martin suffered from a kind of depression that caused agitation and an inability to think clearly. Dr. Wolf's opinion was that Martin's state of mind at the time of the killing "would have been disordered sufficiently as to inhibit her from making certain moves that would require specific intent." Martin told Dr. Wolf that she felt that the devil came to her and manifested himself in the three days before the killing. Dr. Wolf felt that this was

> further evidence that this depression at that particular point in time had reached psychotic proportions. That not only was there a panic, not only was there a feeling of having to do something, but that somehow in addition a feeling of supernaturalness had come into it, and that she clearly then was in less control of herself than—than she normally is.

Dr. Wolf conceded that Martin intentionally killed Paustian, but concluded that her act of killing was irrational because she had not thought out the consequences of the act of killing and because part of her motive in killing was to know where Paustian was and to deprive the other woman of his company.

The state called Dr. Irvin A. Rothrock, a Fairbanks psychiatrist, in rebuttal. Dr. Rothrock believed Martin, at the time of the killing, was undergoing an acute depressive episode precipitated by the threatened breakup of her relationship with Paustian. Dr. Rothrock concluded that Martin's insight was reasonably good, but that her judgment was quite poor. He stated that he believed that Martin intended to kill Paustian when she shot him.

## JURY INSTRUCTIONS

### Extreme Emotional Disturbance

Martin contends that the trial court erred in refusing to give Alaska Pattern Jury Instruction (Criminal) 41.120(a)(1) (1980) defining manslaughter. It provides that if without legal justification, a person acts with either an intentional, knowing, or reckless state of mind and causes the death of another person under circumstances not amounting to murder in the first or second degree, that person is guilty of manslaughter. This instruction is based on AS 11.41.120(a)(1) which is derived from former AS 11.15.040 which was a catchall provision governing all unlawful killings which were not murder. Alaska Criminal Code Revision Part 1 at 97 (Tent. Draft 1977) [hereinafter cited as Tentative Draft]. In the context of this case Martin contends manslaughter was a lesser-included offense. Martin's proposed instruction differed somewhat from the pattern instruction. It told the jury that Martin could be found guilty of manslaughter if she knowingly caused the death of another under circumstances not amounting to murder in the first or second degree. At the request of the prosecution and over Martin's objection the term "knowingly" was stricken and in its place "recklessly" was substituted. Martin contends that this substitution amounted to prejudicial error. The prosecutor successfully persuaded the trial court that on the facts of Martin's case any intentional or knowing homicide would be first or second-degree murder, not manslaughter, since only "heat of passion" could reduce a knowing or intentional homicide to manslaughter under current law. The prosecutor also successfully argued that Martin was not entitled to an instruction on heat of passion. Martin objects to this conclusion as well which will be discussed hereafter.

Assuming arguendo that the court was correct in excluding an instruction on heat of passion, Martin nevertheless contends that she could have been guilty of an intentional or knowing homicide which would be manslaughter, not murder. She reasons that the trial court should have permitted her to argue the Model Penal Code concept of "extreme emotional disturbance" as a defense to murder. See Model Penal Code

Part II § 210.3 commentary at 49 (1980). She notes that Model Penal Code § 210.3 provides in relevant part:

> *Manslaughter.* (1) Criminal homicide constitutes manslaughter when:
>
> . . . .
>
> (b) a homicide which would otherwise be murder is committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse. The reasonableness of such explanation or excuse shall be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be.

*Id.* at 43. She points out that there is a substantial difference between "extreme emotional disturbance" and common law heat of passion, and concludes that she was entitled to have the jury instructed that either theory, if established to the jury's satisfaction, would warrant conviction of manslaughter rather than murder.

■ We are satisfied that the legislature did not intend to make "extreme emotional disturbance" a defense to murder. We reach this conclusion based upon our evaluation of the Revised Code and particularly the part the Tentative Draft played in its enactment. See *Neitzel v. State,* 655 P.2d 325 (Alaska 1982) (relationship between the Tentative Draft and the Revised Code discussed). AS 11.41.100 (murder in the first degree) is based in part on Tentative Draft § 11.41.110, except that the Revised Code differentiates murder into first and second-degree murder while the Tentative Draft had only one classification of murder. *Compare* AS 11.41.100 and AS 11.41.110 *with* Tentative Draft § 11.41.110(a). The Tentative Draft provisions governing murder are based in part upon Oregon Revised Statutes §§ 163.005–115 and in part upon similar provisions from Illinois Criminal Code, Chapter 38 §§ 9–1(a)(1), (2) and 9–2(a). Tentative Draft, *supra* at 97. Oregon adopted "extreme emotional disturbance" as a defense to murder in reliance on the Model Penal Code. *See State v. Carson,* 292 Or. 451, 640 P.2d 586 (Or.1982) (discussing and applying former ORS 163.125(1)(b)).

The Alaska legislature did not enact a similar statute thus making clear its awareness of this defense and its intention to refuse to enact it. Under these circumstances it would be inappropriate for us to read "extreme emotional disturbance" into the new code as a defense.

### Heat of Passion

Martin contends that the trial court erred in denying an instruction on "heat of passion." AS 11.41.115 enumerates defenses to murder. It provides in relevant part:

> (a) In a prosecution under § 100(a)(1) or 110(a)(1) of this chapter, it is a defense that the defendant acted in a heat of passion, before there had been a reasonable opportunity for the passion to cool, when the heat of passion resulted from a serious provocation by the intended victim.
>
> . . . .
>
> (f) In this section,
>
> (1) "intended victim" means a person whom the defendant was attempting to kill or to whom the defendant was attempting to cause serious physical injury when he caused the death of the person he is charged with killing;
>
> (2) "serious provocation" means conduct which is sufficient to excite an intense passion in a reasonable person in the defendant's situation, other than a person who is intoxicated, under the circumstances as he reasonably believed them to be; insulting words, insulting gestures, or hearsay reports of conduct engaged in by the intended victim do not alone or in combination with each other, constitute serious provocation.

This section is derived from Tentative Draft § 11.41.110 which provided in relevant part:

> (b) In a prosecution [for murder], it is a defense that the defendant acted in a heat of passion, before there had been a reasonable opportunity for the passion to cool, when the heat of passion resulted from a serious provocation by the intended victim. Nothing in this subsection precludes a prosecution for or conviction

of manslaughter or any other crime. The defendant shall have the burden of injecting the issue of a defense under this section.

. . . .

(f) In this section

(1) "intented victim" means a person who the defendant was attempting to kill or to whom the defendant was attempting to cause serious physical injury when he caused the death of the person he is charged with killing;

(2) "serious provocation" means conduct which is sufficient to excite an intense passion in a reasonable person in the actor's situation under the circumstances as he reasonably believed them to be; the term does not include mere insulting words, mere insulting gestures, or hearsay reports of conduct by the intended victim.

Tentative Draft, *supra* at 18–20. This provision in the Tentative Draft was based on Illinois Criminal Code, Chapter 38 § 9–2(a). *Id.* at 97. This Illinois code section as amended in 1972 provided in relevant part:

*Voluntary Manslaughter.* (a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, or

(2) Another whom the offender endeavors to kill, but he negligently or accidently causes the death of the individual killed.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

Since the Alaska statute is based upon an Illinois statute, cases and commentary interpreting the Illinois statute published prior to the adoption of AS 11.41.115 are persuasive as to its meaning. *See Gray v. State,* 463 P.2d 897, 902 (Alaska 1970); *Carman v. State,* 658 P.2d 131, 136 n. 2 (Alaska App.1983). The committee comments to the Illinois statute indicate that the heat of passion defense as codified parallels the common law.

The definition and various recognized categories of "serious provocation" appear to have remained in much of the same form as under the common law. The test is that of the reasonable man, and only a few categories of provocation have been recognized—substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse; but not mere words or gestures or trespass to property.

. . . .

Section 9–2 is intended to be a concise statement of the common-law offense, compatible with the reported cases in this State. "Sudden and intense passion" is submitted as a brief but adequate descriptive phrase which means the same as the former "sudden violent impulse of passion supposed to be irresistible," followed by a description of the "cooling-off" period which negatives such passion.

Illinois Criminal Code, Chapter 38 § 9–2, Committee Comments at 393–94 (1972) (citations omitted).

There are two lines of Illinois authority dealing with factual situations similar to this case. The first line of cases is consistent with the general Illinois view that only substantial injury or assault, sudden quarrels leading to mutual combat, illegal arrests, and adultery with the offender's spouse can mitigate murder to manslaughter. These decisions have sustained trial court refusals to give lesser-included offense instructions on voluntary manslaughter where a person kills his lover or spouse after learning during a verbal quarrel that his victim intends to terminate their relationship. *See, e.g., People v. Arnold,* 17 Ill.App.3d 1043, 309 N.E.2d 89 (Ill.App. 1974). Another line of cases involving similar facts appear to reach an inconsistent result. In these cases a lesser-included offense instruction on voluntary manslaughter was given by the trial court at defendant's request and he was convicted of manslaughter. The defendant then appealed citing the first line of cases and arguing that on the facts the crime was either mur-

der or nothing. Understandably, the appellate courts affirmed the manslaughter conviction finding sufficient evidence of "heat of passion." The two lines of cases are discussed in *United States ex rel. Peery v. Sielaff,* 615 F.2d 402 (7th Cir.1979). There the court stated:

> Some cases do suggest that the break-up of a marriage can give rise to a sudden and intense passion. . . . All of these cases are challenges to manslaughter convictions. They illustrate at most the deference of the reviewing courts to the fact finder's determinations.

*Id.* at 406 (citations omitted).

■ It is not necessary for us to determine in this case whether we will follow Illinois in limiting the "heat of passion" defense to situations of substantial violence or discovered adultery. We are satisfied that even a substantially broader reading of our statute would not entitle Martin to an instruction on "heat of passion" viewing the facts of this case most favorably to her. We reach our conclusion based upon the totality of the circumstances, taking into account the following: (1) Martin learned that Paustian was dissatisfied with their relationship over four months prior to the killing on March 12, 1981; (2) in mid-February, 1981, approximately thirty days before the killing, Martin learned Paustian was seeing another woman; (3) two weeks before the killing, Martin learned who Paustian was seeing; (4) during the three days preceding the killing Martin spoke on a number of occasions to friends, comparing her situation with that of Jean Harris, whose murder of her lover, Dr. Tarnower, under similar circumstances, had received substantial publicity, and telling them that she could kill Paustian and his new woman friend; (5) at the time of the killing, Paustian had not raised his voice, threatened Martin, or tried to strike her; finally (6) Martin testified that immediately prior to the shooting she had asked Paustian how he expected them to get along when he wouldn't have anything to do with her. He had responded, "I don't want anything to do with you now." Martin stated that this rejection precipitated her actions. She went to her art room in a fury to get her loaded gun. She then returned and shot Paustian in the side while he was washing his hands. When Paustian turned in horror, she shot him again and continued to shoot him after brief lapses of time until her gun was nearly empty. Under all these circumstances, we believe the trial court properly found that there was insufficient evidence of "heat of passion" to warrant an instruction on that defense. *See LaLonde v. State,* 614 P.2d 808, 809 (Alaska 1979).

### Jury Consideration of Punishment

■ The trial court instructed the jury:

> In arriving at a verdict in this case, the subject of penalty or punishment is not to be discussed or considered by you as that matter is one that lies *solely* with the court and must not in any way affect your decision as to the innocence or guilt of the defendant.

(Emphasis added.) Martin did not object to this instruction at trial and therefore must establish "plain error" to prevail on appeal. Alaska R.Crim.P. 30(a); Alaska R.Crim.P. 47(b). A plain error in an instruction is one that is both obvious and substantially prejudicial. *Carman v. State,* 658 P.2d 131, 137 (Alaska App.1983); *Marrone v. State,* 653 P.2d 672, 676 (Alaska App.1982). Martin makes two arguments. First, she contends that the instruction was factually inaccurate since it told the jury that punishment lies "solely" with the court when in fact the legislature has established a minimum twenty-year penalty for first-degree murder. Second, she argues the instruction invaded the jury's province because it prevented the jury from tempering justice with mercy. Martin argues that the jury should have been permitted to evaluate her conduct in light of a minimum twenty-year sentence and determine whether, in the jury's collective view, her conduct warranted such a severe sentence. If the jury concluded that it did not Martin contends the jury could properly return a verdict of not guilty of first-degree murder regardless

of its factual findings on the elements of that offense.

■ We find no plain error. The instruction accurately told the jury that it should not consider punishment in determining whether Martin was guilty of an offense. *See United States v. Caldwell,* 543 F.2d 1333, 1364–65 (D.C.Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *United States v. Del Toro,* 426 F.2d 181, 184 (5th Cir.), *cert. denied,* 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 60 (1970); *Commonwealth v. Ferreira,* 373 Mass. 116, 364 N.E.2d 1264, 1270 (Mass.1977). We are satisfied that the instruction in context did not mislead the jury.

Martin's reliance on *United States v. Glick,* 463 F.2d 491, 493–94 (2d Cir.1972), is misplaced. There the trial court, in the absence of the defendant, responded with a single word, "yes," to a jury question whether the court would consider a recommendation for leniency. The appellate court was concerned that the response might have swayed jurors entertaining reasonable doubts to vote for conviction because they believed it was in their power to soothe their consciences by causing little or no punishment to be imposed. In the instant case the instruction was given as part of the general instructions. There is no indication that the Martin jury was ever "hung."

Our decision that jurors should not be permitted to consider punishment in arriving at their verdict is consistent with the supreme court's decision in *Schade v. State,* 512 P.2d 907, 917–18 (Alaska 1973). In *Schade,* the court followed a decision of the District of Columbia Circuit Court of Appeals, *Lyles v. United States,* 254 F.2d 725, 728 (D.C.Cir.1957), *cert. denied,* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), which held that a defendant, on request, was entitled to an instruction telling the jury that a verdict of not guilty by reason of insanity would not necessarily result in the freedom of the defendant but could result in a hospitalization order if the trial court was convinced that the defendant was dangerous. *See United States v. Brawner,*

471 F.2d 969, 997 (D.C.Cir.1972) (modifying *Lyles* instruction to reflect 1970 statute). In *United States v. Caldwell,* the court distinguished *Lyles* in the following way:

> In *Lyles v. United States, supra* note 61, we concluded that not all laymen can be presumed to know the true meaning and impact of a verdict of not guilty by reason of insanity. Therefore, we held, jurors must be informed of the relevant consequences of such a finding, to supplement their common knowledge of the simpler verdicts of guilty and not guilty.... That, of course, is a situation very different from the one present here [whether to instruct jurors on the penalties that would result from various verdicts].

543 F.2d at 1365 n. 164.

We are satisfied that the distinction drawn by the District of Columbia Court of Appeals is sound and that the trial court properly declined to inform the jury of the minimum penalties prescribed by law for those found guilty for first-degree murder. Since the jury was properly instructed not to consider punishment at all in reaching its conclusions, it necessarily follows that any misconceptions individual jurors may have had regarding sentencing discretion would be irrelevant to their function and could not constitute prejudicial error.

## SENTENCE

For the first time on appeal Martin challenges the constitutionality of the twenty-year minimum sentence for first-degree murder. She argues that it constitutes cruel and unusual punishment in violation of article 1, § 12 of the Alaska Constitution, and the eighth amendment of the United States Constitution. She also claims that it deprives her of substantive due process and the equal protection of the laws in violation of the fourteenth amendment to the United States Constitution and of the comparable provisions in the Alaska Constitution. The state points out that Martin did not raise these issues in the court below and suggests that we may not consider them unless we are satisfied that the minimum sentence

constitutes "plain error." Alaska R.Crim.P. 47(b). Without foreclosing further consideration of these issues in the future in light of a more adequate record, we have elected to address Martin's constitutional arguments at this time.

■ Martin contends that the statute establishing a twenty-year minimum sentence for first-degree murder is unconstitutional on its face and not only as applied to her. Thus she contends that it is void and that the trial court had no jurisdiction to impose the penalty upon her. The state's argument misconceives the distinction between jurisdictional errors which deprive the court of power to act and alleged plain errors which, while affecting fundamental rights and being substantially prejudicial, do not affect the trial court's jurisdiction. While an appellate court has a great deal of discretion in determining whether to identify a given alleged error as "plain" it must reach challenges to the jurisdiction of the trial court to act. Where the record is inadequate for this purpose a remand is the normal recourse. We are satisfied that a remand is not necessary in this case.

■ We find little merit in Martin's argument predicated on article 1, § 12 of the Alaska Constitution or her due process, cruel and unusual punishment and equal protection challenges. Legislatures have traditionally reserved the highest penalties for intentional homicide. Our legislature could reasonably label it an unclassified offense and conclude that a minimum twenty-year sentence was necessary for affirmation of community norms and deterrence of others. The special significance attached historically to murder answers Martin's constitutional claims.

We note that AS 12.55.155 sets out mitigating and aggravating factors to be considered by the trial judge in imposing sentences on those convicted of classified crimes, and 12.55.005 sets out factors to be considered by trial judges in imposing sentences on first offenders convicted of classified crimes. We are satisfied, however, that the legislature has in effect established mitigating factors for homicides by differentiating between degrees of murder, by differentiating murder and manslaughter, and by enumerating specific defenses to murder. The only distinction between the treatment of murder and other felonies is that the aggravating and mitigating factors for classified offenses are determined by the trial judge, while those factors deemed in aggravation or mitigation of homicide are to be determined by the jury. This distinction did not deny Martin the equal protection of the laws.

■ The judgment of the superior court is AFFIRMED.[2]

---

2. Martin raises three other issues which we briefly address:

(1) Martin argues that the trial court erred in instructing the jury that "insanity is not an issue." There was clearly evidence in the record from which a jury could have found Martin not guilty by reason of insanity (NGI) under the standard established in *Christie v. State,* 580 P.2d 310 (Alaska 1978). We are satisfied, however, that Martin knowingly, intelligently and voluntarily waived the right to present this issue to the jury. Her counsel assured the trial court that he did not want instructions based on former AS 12.45.083 (mental disease or defect excluding responsibility). Martin no doubt expected to be acquitted or found guilty of manslaughter and feared that an instruction on the statutory defense might result in a NGI verdict followed by a substantial period of institutionalization. *See Clark v. State,* 645 P.2d 1236 (Alaska App.1982) (a woman was charged with attempted murder and found NGI; she was then committed for a period not to exceed twenty years). At oral argument Martin reiterated her position that insanity was not an issue and that she did not want the jury instructed on former AS 12.45.083. Under these circumstances the trial court did not err in giving the instruction it did. In reaching this conclusion we have considered the possible adverse effect of the instruction on Martin's defense of diminished capacity and note that she did not object to the instruction on this ground. Also, considering the context in which the instruction was given, we are satisfied that the jury was not misled into believing that it referred to the defense of diminished capacity.

(2) Martin argues she was entitled to a judgment of acquittal on the ground that diminished capacity was established as a matter of law. We are satisfied that reasonable jurors could differ as to whether the state proved that Martin intentionally shot Paustian despite her mental problems. *See* former AS 12.45.085. The trial court did·not err in denying her motion for

judgment of acquittal on the charge of first-degree murder.

(3) Martin argues that the trial court erred in denying her motion for mistrial when the prosecutor asked Dr. Wolf, "Isn't it true a trial judge accused you of having a defense bias?" The trial court *sua sponte* disallowed the question and instructed the jury to disregard it. While the question was clearly improper and warranted sanction, we do not believe that it amounted to incurable error under the circumstances of this case. We note Dr. Ohlson, who also testified on behalf of Martin, and Dr. Rothrock, who testified on behalf of the state, were in general agreement with Dr. Wolf regarding Martin's diagnosis as it might pertain to the defense of diminished capacity. Under these circumstances, the trial court did not err in denying the motion for mistrial. *See Sheakley v. State,* 644 P.2d 864 (Alaska App.1982); *Roth v. State,* 626 P.2d 583 (Alaska App.1981).