[Crim. No. 19194. Dec. 8, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT JOSEPH BERRY, Defendant and Appellant.

510

**COUNSEL**

Edward W. Suman, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Conrad D. Petermann and Alan S. Meth, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SULLIVAN, J.**—Defendant Albert Joseph Berry was charged by indictment with one count of murder (Pen. Code, § 187) and one count of assault by means of force likely to produce great bodily injury (Pen.

Code, § 245, subd. (a)).[1] The indictment was amended to allege one prior felony conviction which defendant admitted.[2] The assault was allegedly committed on July 23, 1974, and the murder on July 26, 1974. In each count, the alleged victim was defendant's wife, Rachel Pessah Berry. A jury found defendant guilty as charged and determined that the murder was of the first degree. (§ 189.) Defendant was sentenced to state prison for the term prescribed by law. He appeals from the judgment of conviction.

Defendant contends that there is sufficient evidence in the record to show that he committed the homicide while in a state of uncontrollable rage caused by provocation and flowing from a condition of diminished capacity and therefore that it was error for the trial court to fail to instruct the jury on voluntary manslaughter as indeed he had requested. He claims: (1) that he was entitled to an instruction on voluntary manslaughter as defined by statute (§ 192) since the killing was done upon a sudden quarrel or heat of passion; and (2) that he was also entitled to an instruction on voluntary manslaughter in the context of a diminished capacity defense (see *People* v. *Mosher* (1969) 1 Cal.3d 379, 385, fn. 1, 389-393 [82 Cal.Rptr. 379, 461 P.2d 659]) since malice was negatived by mental defect or disease. (*People* v. *Conley* (1966) 64 Cal.2d 310, 316-323 [49 Cal.Rptr. 815, 411 P.2d 911].) We agree with defendant as to the first instruction, but not as to the second.

Defendant, a cook, 46 years old, and Rachel Pessah, a 20-year-old girl from Israel, were married on May 27, 1974. Three days later Rachel went to Israel by herself, returning on July 13, 1974. On July 23, 1974, defendant choked Rachel into unconsciousness. She was treated at a hospital where she reported her strangulation by defendant to an officer of the San Francisco Police Department. On July 25, Inspector Sammon, who had been assigned to the case, met with Rachel and as a result of the interview a warrant was issued for defendant's arrest.

While Rachel was at the hospital, defendant removed his clothes from their apartment and stored them in a Greyhound Bus Depot locker. He stayed overnight at the home of a friend, Mrs. Jean Berk, admitting to her that he had choked his wife. On July 26, he telephoned Mrs. Berk

[1]Hereafter, unless otherwise indicated, all section references are to the Penal Code.

[2]Upon appeal, the Attorney General concedes that the trial court accepted defendant's admission of the prior felony conviction without satisfying the requirements of *In re Yurko* (1974) 10 Cal.3d 857 [112 Cal.Rptr. 513, 519 P.2d 516], and states that the reference to this prior conviction in the judgment should be stricken.

and informed her that he had killed Rachel with a telephone cord on that morning at their apartment. The next day Mrs. Berk and two others telephoned the police to report a possible homicide and met Officer Kelleher at defendant's apartment. They gained entry and found Rachel on the bathroom floor. A pathologist from the coroner's office concluded that the cause of Rachel's death was strangulation. Defendant was arrested on August 1, 1974, and confessed to the killing.

At trial defendant did not deny strangling his wife, but claimed through his own testimony and the testimony of a psychiatrist, Dr. Martin Blinder, that he was provoked into killing her because of a sudden and uncontrollable rage so as to reduce the offense to one of voluntary manslaughter. He testified that upon her return from Israel, Rachel announced to him that while there she had fallen in love with another man, one Yako, and had enjoyed his sexual favors, that he was coming to this country to claim her and that she wished a divorce. Thus commenced a tormenting two weeks in which Rachel alternately taunted defendant with her involvement with Yako and at the same time sexually excited defendant, indicating her desire to remain with him. Defendant's detailed testimony, summarized below, chronicles this strange course of events.

After their marriage, Rachel lived with defendant for only three days and then left for Israel. Immediately upon her return to San Francisco she told defendant about her relationship with and love for Yako. This brought about further argument and a brawl that evening in which defendant choked Rachel and she responded by scratching him deeply many times. Nonetheless they continued to live together. Rachel kept taunting defendant with Yako and demanding a divorce. She claimed she thought she might be pregnant by Yako. She showed defendant pictures of herself with Yako. Nevertheless, during a return trip from Santa Rosa, Rachel demanded immediate sexual intercourse with defendant in the car, which was achieved; however upon reaching their apartment, she again stated that she loved Yako and that she would not have intercourse with defendant in the future.

On the evening of July 22d defendant and Rachel went to a movie where they engaged in heavy petting. When they returned home and got into bed, Rachel announced that she had intended to make love with defendant, "But I am saving myself for this man Yako, so I don't think I will." Defendant got out of bed and prepared to leave the apartment

whereupon Rachel screamed and yelled at him. Defendant choked her into unconsciousness.

Two hours later defendant called a taxi for his wife to take her to the hospital. He put his clothes in the Greyhound bus station and went to the home of his friend Mrs. Berk for the night. The next day he went to Reno and returned the day after. Rachel informed him by telephone that there was a warrant for his arrest as a result of her report to the police about the choking incident. On July 25th defendant returned to the apartment to talk to Rachel, but she was out. He slept there overnight. Rachel returned around 11 a.m. the next day. Upon seeing defendant there, she said, "I suppose you have come here to kill me." Defendant responded, "yes," changed his response to "no," and then again to "yes," and finally stated "I have really come to talk to you." Rachel began screaming. Defendant grabbed her by the shoulder and tried to stop her screaming. She continued. They struggled and finally defendant strangled her with a telephone cord.

Dr. Martin Blinder, a physician and psychiatrist, called by the defense,[3] testified that Rachel was a depressed, suicidally inclined girl and that this suicidal impulse led her to involve herself ever more deeply in a dangerous situation with defendant. She did this by sexually arousing him and taunting him into jealous rages in an unconscious desire to provoke him into killing her and thus consummating her desire for suicide. Throughout the period commencing with her return from Israel until her death, that is from July 13 to July 26, Rachel continually provoked defendant with sexual taunts and incitements, alternating acceptance and rejection of him. This conduct was accompanied by repeated references to her involvement with another man; it led defendant to choke her on two occasions, until finally she achieved her unconscious desire and was strangled. Dr. Blinder testified that as a result of this cumulative series of provocations, defendant at the time he fatally strangled Rachel, was in a state of uncontrollable rage, completely under the sway of passion.

We first take up defendant's claim that on the basis of the foregoing evidence he was entitled to an instruction on voluntary manslaughter as defined by statute which is "the unlawful killing of a human being, without malice . . . upon a sudden quarrel or heat of passion." (§ 192.) In

[3]Dr. Blinder was appointed by the court to examine defendant pursuant to Evidence Code sections 730 and 1017. The defense called only two witnesses—Dr. Blinder and defendant himself.

*People* v. *Valentine* (1946) 28 Cal.2d 121 [169 P.2d 1], this court, in an extensive review of the law of manslaughter, specifically approved the following quotation from *People* v. *Logan* (1917) 175 Cal. 45, 48-49 [164 P. 1121] as a correct statement of the law: "In the present condition of our law *it is left to the jurors* to say whether or not the facts and circumstances in evidence are sufficient to lead them to believe that the defendant did, or to create a reasonable doubt in their minds as to whether or not he did, commit his offense under a heat of passion. The jury is further to be admonished and advised by the court that this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances, and that, consequently, no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man. . . . For the fundamental of the inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and never, of course, the passion for revenge—to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." (28 Cal.2d at pp. 138-139, italics in original.)

We further held in *Valentine* that there is no specific type of provocation required by section 192 and that verbal provocation may be sufficient. (28 Cal.2d at pp. 141-144.) In *People* v. *Borchers* (1958) 50 Cal.2d 321, 329 [325 P.2d 97] in the course of explaining the phrase "heat of passion" used in the statute defining manslaughter we pointed out that "passion" need not mean "rage" or "anger" but may be any "[v]iolent, intense, high-wrought or enthusiastic emotion" and concluded there "that defendant was aroused to a heat of 'passion' by a series of events over a considerable period of time. . . ." (50 Cal.2d at p. 328, 329.) Accordingly we there declared that evidence of admissions of infidelity by the defendant's paramour, taunts directed to him and other conduct, "supports a finding that defendant killed in wild desperation induced by [the woman's] long continued provocatory conduct." (50 Cal.2d at p. 329.) ▪ We find this reasoning persuasive in the case now before us. Defendant's testimony chronicles a two-week period of provocatory conduct by his wife Rachel that could arouse a passion of jealousy, pain and sexual rage in an ordinary man of average disposition such as to cause him to act rashly from this passion. It is significant that both

defendant and Dr. Blinder testified that the former was in the heat of passion under an uncontrollable rage when he killed Rachel.

The Attorney General contends that the killing could not have been done in the heat of passion because there was a cooling period, defendant having waited in the apartment for 20 hours. However, the long course of provocatory conduct, which had resulted in intermittent outbreaks of rage under specific provocation in the past, reached its final culmination in the apartment when Rachel began screaming. Both defendant and Dr. Blinder testified that defendant killed in a state of uncontrollable rage, of passion, and there is ample evidence in the record to support the conclusion that this passion was the result of the long course of provocatory conduct by Rachel, just as the killing emerged from such conduct in *Borchers*. The Attorney General relies principally on *People* v. *Bufarale* (1961) 193 Cal.App.2d 551, 559-563 [14 Cal.Rptr. 381] but the reliance is misplaced. *Bufarale* merely held that the defendant's killing of a married woman with whom he had been living was not, as a matter of law, upon the heat of passion since the defendant's act was one of vengeance, preceded by neither a quarrel with, nor by adequate provocatory conduct on the part of, the victim, who had decided to return to her husband.

We turn to defendant's second contention that under the evidence in the record he was entitled to an instruction on voluntary manslaughter in the context of a diminished capacity defense. "As we indicated in *People* v. *Conley* (1966) 64 Cal.2d 310, 318, the enumeration of nonmalicious homicides contained in section 192 is not complete. Since section 192 was enacted prior to the development of the concept of diminished capacity . . . it did not include those nonmalicious homicides in which there is a lack of malice resulting from a diminished capacity to entertain that mental state . . . . [¶] We therefore delineated in *Conley* a standard to be applied in the determination of whether, in cases involving diminished capacity, the state of mind amounting to malice aforethought is present: 'An intentional act that is highly dangerous to human life, done in disregard of the actor's awareness that society requires him to conform his conduct to the law, is done with malice regardless of the fact that the actor acts without ill will toward his victim or believes that his conduct is justified. . . . If because of mental defect, disease, or intoxication, however, the defendant is unable to comprehend his duty to govern his actions in accord with the duty imposed by law, he does not act with malice aforethought . . . .' (*People* v. *Conley, supra,* 64 Cal.2d 310, 322.)"

(*People* v. *Morse* (1969) 70 Cal.2d 711, 735-736 [76 Cal.Rptr. 391, 452 P.2d 607].) The essence of a showing of diminished capacity is a "showing that the defendant's mental capacity was reduced by *mental illness, mental defect or intoxication.*" (Italics added.) (*People* v. *Castillo* (1969) 70 Cal.2d 264, 270 [74 Cal.Rptr. 385, 449 P.2d 449].)

Since in the instant case there is no evidence of intoxication, defendant must demonstrate evidence in the record that his mental capacity was reduced by mental disease or mental defect. Of the many cases decided since *Conley* wherein our courts have reiterated the applicability of diminished capacity evidence to negative malice, the great majority have involved diminished capacity due to voluntary intoxication (e.g., *People* v. *Mosher, supra,* 1 Cal.3d 379, 391; *People* v. *Graham* (1969) 71 Cal.2d 303, 316 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Castillo, supra,* 70 Cal.2d 264, 270; *People* v. *Small* (1970) 7 Cal.App.3d 347, 356 [86 Cal.Rptr. 478]). *Conley* itself involved voluntary intoxication. Therefore the court in *People* v. *Long* (1974) 38 Cal.App.3d 680 [113 Cal.Rptr. 530] felt that it was faced with a question of first impression, namely, whether mental illness or mental defect *without* intoxication could reduce murder to voluntary or involuntary manslaughter. (But see *People* v. *Gorshen* (1959) 51 Cal.2d 716, 726-727 [336 P.2d 492] where diminished capacity based on mental illness was held relevant to negate intent to kill.) *Long* correctly concluded that mental capacity reduced by mental illness or mental defect without intoxication is sufficient to show diminished capacity.

Nonetheless the *sine qua non* of such a showing is that there be evidence of either mental illness or mental defect. ▇ Defendant fails to point out to us, nor can we find, anywhere in the record, such requisite evidence. Dr. Blinder specifically testified that defendant was sane and that he was neither schizophrenic nor psychotic. He at no time testified that defendant was suffering from a mental illness or mental defect. Rather he stated that at the time of the killing, defendant was in an "altered mental state," which the doctor identified as one of uncontrollable rage and he further explained that this state was "a product of having to contend with what seems to me an incredibly provocative situation, an incredibly provocative young woman, and that this immediate situation was superimposed upon Mr. Berry having encountered the situation time and time again." In sum, Dr. Blinder testified to a heat of passion aroused in defendant by a course of provocatory conduct on the part of Rachel, but never testified to any mental illness or mental defect on the

part of defendant. Therefore, defendant was not entitled to an instruction on voluntary manslaughter in the context of diminished capacity and the trial court did not err in refusing such instruction.

However, as we have already explained, the court did commit error in refusing to instruct on voluntary manslaughter based on sudden quarrel or heat of passion. Defendant contends that this constitutes prejudicial error which compels reversal of the judgment as to the murder count. In accordance with the dictates of *People* v. *Sedeno* (1974) 10 Cal.3d 703, 720-721 [112 Cal.Rptr. 1, 518 P.2d 913] we have examined the instructions given to determine whether the jury necessarily resolved, although in a different setting, that defendant had not committed the homicide in a heat of passion induced by the provocation of Rachel. While the instructions made passing reference to heat of passion and provocation for the purpose of distinguishing between murder of the first and second degrees, such reference was only casually made. ■ There was no clear direction to the jury to consider the evidence of Rachel's course of provocatory conduct so as to determine whether defendant, as an ordinary man of average disposition (see *People* v. *Logan* (1917) 175 Cal. 45, 49 [164 P. 1121]) having been exposed to such conduct, was provoked into committing the homicide under a heat of passion. ■ Therefore we conclude that the jury's determination that defendant was guilty of murder of the first degree under the instructions given did not necessarily indicate that "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions" (*Sedeno* at p. 721)—in other words that the jury had found that defendant had not killed Rachel under a heat of passion. Since this theory of provocation constituted defendant's entire defense to the first count, we have no difficulty concluding that the failure to give such instruction was prejudicial error (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) and requires us to reverse the conviction of murder of the first degree.[4]

With respect to his conviction of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)) as charged in the second count, defendant contends that it was error for the court to fail to instruct *sua sponte* on simple assault as a lesser and included offense.

---

[4]The trial court gave an instruction to the effect that malice is implied when the killing is a direct result of the perpetration of a felony inherently dangerous to human life. Since the only possible felony involved was the assault which culminated in the strangling, it was error, as conceded by the Attorney General, for the court to so instruct. (*People* v. *Ireland* (1969) 70 Cal.2d 522, 539-540 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

(§ 240.) ■ "[T]he trial court may properly refuse to instruct upon simple assault where the evidence is such as to make it clear that if the defendant is guilty at all, he is guilty of the higher offense [felonious assault]." (*People* v. *McCoy*, 25 Cal.2d 177, 187-188 [153 P.2d 315]; *People* v. *Groce* (1971) 18 Cal.App.3d 292, 295 [95 Cal.Rptr. 688].) Defendant testified that he choked Rachel until she became unconscious, which necessarily indicates force likely to produce great bodily injury. There was no evidence in the record which would have supported simple assault. There being no other contentions by defendant concerning the conviction for assault with force likely to produce great bodily harm, the judgment as to that count is affirmed.

In view of our above conclusions, we need not consider defendant's remaining contentions.

As to count one, charging a violation of section 187, the judgment is reversed; as to count two, charging a violation of section 245, subdivision (a), the judgment is modified by striking all reference to defendant's prior felony conviction, and as modified, is affirmed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Richardson, J., concurred.