**Jana F. DANDOVA, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–7814.

Court of Appeals of Alaska.

June 20, 2003.

Kathleen A. Murphy, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Rosamund M. Lockwood, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Jana Dandova attempted to kill her former lover, Craig Schumacher, by shooting him. She was indicted for attempted murder [1] and first-degree assault [2].

At her trial, Dandova asked to have the jury instructed on the defense of heat of passion, a defense codified in AS 11.41.115(a) & (f). The trial judge concluded that Dandova was not entitled to raise this defense because, even viewing the facts in the light

---

**1.** AS 11.41.100(a)(1)(A).

**2.** AS 11.41.200(a)(1)—recklessly causing serious physical injury to another person by means of a dangerous instrument.

most favorable to Dandova, Schumacher had done nothing to provoke Dandova on the day of the shooting—and thus Dandova could not show that she acted in response to "serious provocation" as defined in AS 11.41.115(f)(2).

In this appeal, Dandova argues that the trial judge interpreted the heat of passion defense too narrowly. She contends that, even though Schumacher's actions on the day of the shooting might not constitute adequate provocation, the requisite provocation was established if Schumacher's actions on the day of the shooting are viewed in conjunction with his past actions during their contentious relationship.

There is some authority to support the proposition that if the victim of a homicide engages in a continuing course of provocative conduct, it is proper to consider that entire course of conduct when assessing a defendant's claim of heat of passion. But, from the record in this case, it appears that Dandova's trial judge shared this view of the law—and he perceived that Dandova's case presented a different question.

Dandova believed that the victim had committed conduct (sexual abuse of their child) that would qualify as "serious provocation" under Alaska law. But this had occurred more than two years before—so long ago that Dandova had cooled. Since that time, the victim had performed other acts which Dandova perceived as injuries and wrongs upon her, but (as explained here) the victim's acts do not qualify as "serious provocation" under Alaska law. Finally, Dandova attempted to kill the victim, not in response to a new act of provocation, but rather because a non-provocative occurrence reminded her of these perceived injuries or wrongs suffered at the hand of the victim.

For the reasons explained here, we conclude that heat of passion is not available under such circumstances. We therefore uphold the trial judge's ruling, and we affirm Dandova's conviction for attempted murder.

### Underlying facts

Jana Dandova and Craig Schumacher began dating in the early 1990's. But soon after they began a romantic relationship, they began to have problems, and their relationship commenced an "on again, off again" cycle. During this time, Dandova became pregnant. Dandova's and Schumacher's relationship ended in 1993, before their son (C.D.) was born.

Dandova testified that the relationship ended because of Schumacher's conduct and attitude during her pregnancy. Schumacher refused to tell others about the pregnancy, and he also would not provide Dandova with any form of assistance. Meanwhile, Dandova confronted a physically difficult pregnancy. She was severely anemic, and she was told that she would have to deliver by Caesarean section. When Dandova informed Schumacher of these complications, his response was to ask Dandova to repay him some money that she had previously borrowed. Dandova testified that this was the last straw: "I wrote him the check, and . . . that was the end of the relationship."

Despite the termination of her romantic relationship with Schumacher, Dandova tried to promote a relationship between Schumacher and their son. But this, too, became problematic.

Shortly after C.D.'s birth, Schumacher began to display behavior that Dandova considered "abnormal". Dandova was especially disturbed by the fact that Schumacher would masturbate while watching Dandova nurse their son. According to Dandova, Schumacher's behavior became increasingly bizarre, and he began to stalk her. Schumacher would sneak into Dandova's house uninvited and would expose himself to her. Then, C.D. began returning from visits to Schumacher's house with a "terrible smell on his hair and hands"—a smell that Dandova believed was Schumacher's semen.

Finally, Dandova told Schumacher that he was no longer welcome in her home. In response, Schumacher told Dandova that he wanted C.D., and he came to Dandova's house to retrieve the child. When Dandova told Schumacher to leave, he refused. An argument ensued, and then a shoving match. At some point, according to Dandova, Schumacher (who is 6' 4" tall) told Dandova (who is 5' 6" or 5' 7") to hit him—so she did. Schumacher then left Dandova's house to

report this "assault" and to try to have Dandova arrested.

Based on this incident, Dandova obtained a restraining order against Schumacher. But shortly afterwards, Schumacher went to court and obtained a modification of this restraining order, allowing him fifty-percent visitation with C.D.

During this period of shared custody, Dandova began to believe that something was wrong with C.D. because he exhibited developmental delays. Then one day, when C.D. was three and a half, C.D.'s babysitter called Dandova and told her that something was wrong with the child. When Dandova arrived at the babysitter's house, C.D. seemed withdrawn. Dandova took the child to the doctor. During the ensuing examination, the doctor found that C.D. had rectal tearing. Dandova suspected that Schumacher was sexually abusing her son. She reported her suspicions to the Division of Family and Youth Services, but DFYS closed its investigation and took no action.

In early 1997, Dandova and Schumacher returned to court to litigate custody of C.D. As part of the custody proceedings, Schumacher was evaluated by a therapist. This therapist, Dr. Gooding, initially testified that he was concerned about Schumacher's behavior, and he believed that C.D. "[might] very well be at risk". Indeed, two months later, after Dr. Gooding had treated Schumacher, Gooding testified that he did not think Schumacher was a normal heterosexual male, due to Schumacher's "unusual sexual history and pattern [of sexual behavior]". In particular, Gooding said, Schumacher had admitted masturbating in front of C.D. But despite this, Gooding testified that he "[did not] believe that Mr. Schumacher need[ed] extensive counseling in the future". According to Gooding, the risk that Schumacher would sexually abuse C.D. was very low.

After hearing this (and other) evidence, Superior Court Judge Ralph R. Beistline concluded that "the evidence [supporting the allegation of] child molest[ation was] very weak". Although he harbored some concerns, the judge concluded that the evidence did not clearly establish that Schumacher was a pedophile or was otherwise a danger to

the child. Accordingly, on December 10, 1997, Judge Beistline ordered that custody of C.D. be divided equally between Dandova and Schumacher. Several days later, Dandova fled to Canada with her son. She later testified that she had done this to protect the child.

While Dandova was in Canada, Schumacher filed a lawsuit against her for defamation. When Dandova failed to answer this lawsuit, Schumacher obtained a default judgement against her for a significant amount of money.

In December 1998 (one year after Dandova absconded to Canada), the authorities located her. Dandova was not extradited (she was a Canadian citizen), but C.D. was returned to Schumacher. At the advice of her Canadian attorney, Dandova returned to Alaska to fight for her son.

At first, Dandova was not permitted to have any contact with C.D. Then she was permitted three 15-minute phone calls per week. In early April 1999, Dandova was granted one hour's supervised visitation with C.D. on Mondays and Wednesdays.

On September 29, 1999 (the day of the shooting), Dandova received a telephone call from her attorney's paralegal: the paralegal told Dandova that the superior court's custody investigator had recommended that Dandova pay a portion of C.D.'s counseling expenses. Dandova mistakenly got the impression that the custody investigator had recommended that she make these payments because Schumacher was poor. (In fact, the custody investigator's report did not contain any information about Schumacher's financial condition. Rather, the custody investigator simply recommended that Dandova, as one of C.D.'s parents, contribute a share of the expenses.)

Dandova testified that, after receiving this phone call from her attorney, she became suicidal. She was already tormented by her conversations with her son, because he would often cry and tell her that he wanted to come live with her. She thought that C.D.'s behavior was regressing, and she believed that Schumacher was using C.D. "to torture" her. In addition, Dandova felt despondent because

Schumacher, by executing on the default judgement, had taken nearly everything she owned. She had lost her home, and she was reduced to living in the upstairs portion of a friend's house. Dandova claimed that Schumacher had even executed on the support checks that she received for her daughter (a child of a former marriage).

Driven by all these thoughts, Dandova got into her car (a vehicle that she was using with the permission of a friend) and began driving around Fairbanks. She testified that, as she drove, she tried to suppress the urge to kill herself.

Dandova testified that she unexpectedly saw Schumacher on the street, getting out of his truck, on his way to visit his attorney. Schumacher's truck was apparently the same make and model as the truck that Dandova owned before she lost everything. At trial, Dandova described her reaction to this encounter:

> *Dandova:* I parked at Hunter [Elementary School] and ... waited [until] he came out [of his attorney's office] and he got [back] into that pickup. And I had just heard that morning how poor Craig [Schumacher], poor Craig, you know, this poor man, how I was going to have to pay for C.D.'s ... counseling visits, and he had just garnished every penny I had. I couldn't even put money in the bank. I had received a custody payment or child support payment from my ex-husband ... and he even got that money out of my bank.... He had ... everything[, and] I didn't have a penny. Any penny I had, he was going to be able to get. And the way I saw it was, "There he is in ... a pickup that was just like mine, that he had tried to illegally garnish from me or whatever, and he's telling [my attorney] how poor he was." And I [was looking at] a pickup that he had bought with my money.... [H]e had gotten over $101,000 from me.

Dandova waited for Schumacher to leave his attorney's office. She knew that there was a handgun under the seat of her car, and she decided to use this weapon to confront Schumacher. When Schumacher returned to his truck, Dandova got out of her vehicle and approached Schumacher's truck on foot. She

held the gun in both hands, pointing it at Schumacher's head. When Schumacher tried to drive forward to escape, Dandova shot him through the neck and the shoulder. Schumacher put the vehicle in motion, but Dandova followed him, still pointing the gun. Schumacher's truck then stalled, so he jumped out. Despite his injuries, Schumacher managed to tackle Dandova—knocking her to the ground, and knocking the gun from her grasp. By this time, people from Schumacher's attorney's office had come outside, and they helped Schumacher restrain Dandova until the police arrived. At the scene, Dandova told Schumacher's attorney that she had shot Schumacher because he had ruined her life.

Dandova gave the following account of the shooting:

> *Dandova:* I just thought [that] I'd run out there and confront him about it, how poor—"So you're so poor, you're so poor". And I don't know, then things ... kind of went fast from then on. I remember coming up to his [vehicle] window, and he realized I had a gun, and ... [he] started backing out or something, and the gun went off in my hand, and the windshield shattered. So then ... he was driving [away] and I was chasing him.... I was determined to basically do some damage to that truck....

Based on this evidence (viewed in the light most favorable to Dandova), Dandova's attorney asked Superior Court Judge Charles R. Pengilly to instruct the jurors on the defense of "heat of passion" codified in AS 11.41.115(a). If the jury had found in Dandova's favor on this issue, her offense would have been reduced to attempted manslaughter. But Judge Pengilly declined to instruct the jurors on heat of passion because he found that Dandova's intense emotion had not resulted from recent serious provocation by the victim, Schumacher. Judge Pengilly further found that, even if some of Schumacher's prior actions might constitute "serious provocation", these provocative actions occurred years before, and therefore a reasonable person's emotions would have cooled.

*The Alaska statute defining the heat of passion defense, and whether it applies to a defendant charged with attempted murder*

AS 11.41.115(a) declares that when a defendant is prosecuted for first-degree murder under AS 11.41.100(a)(1)(A) or for second-degree murder under AS 11.41.110(a)(1), "it is a defense [to murder, but not to manslaughter or any other crime [3]] that the defendant acted in a heat of passion, before there had been a reasonable opportunity for the passion to cool, when the heat of passion resulted from a serious provocation by the intended victim".

The term "serious provocation" is defined in subsection (f)(2) of this same statute:

"serious provocation" means conduct which is sufficient to excite an intense passion in a reasonable person in the defendant's situation, other than a person who is intoxicated, under the circumstances as the defendant reasonably believed them to be; insulting words, insulting gestures, or hearsay reports of conduct engaged in by the intended victim do not, alone or in combination with each other, constitute serious provocation.

Before we begin our discussion of whether Dandova was entitled to a jury instruction on heat of passion under the facts of this case, we must address a legal contention raised by the State: the argument that the heat of passion defense is not available to a defendant charged with *attempted* murder.

AS 11.41.115(a) states that the heat of passion defense is available in prosecutions "under AS 11.41.100(a)(1)(A) or AS 11.41.110(a)(1)". Because the statute does not explicitly add "or in prosecutions for attempts to commit these forms of murder", the State argues that the legislature did not intend for this statute to apply when a defendant is charged with attempted murder.

(This issue arises only in prosecutions for attempted first-degree murder be-

cause, as this Court held in *Huitt v. State,* 678 P.2d 415, 420 (Alaska App.1984), and as we explained again in *Guertin v. State,* 854 P.2d 1130, 1132 (Alaska App.1993), there is no crime of "attempted second-degree murder" under Alaska law. A prosecution for attempted murder requires proof of the defendant's intent to kill.[4] Anyone who engages in life-threatening conduct with the requisite culpable mental state for attempted murder—intent to kill—is necessarily guilty of an attempt to commit *first*-degree murder as defined in AS 11.41.100(a)(1)(A). Thus, the crime of "attempted second-degree murder" would be superfluous.[5])

The failure of AS 11.41.115(a) to explicitly mention attempts to commit murder does not necessarily mean that heat of passion is unavailable as a defense in prosecutions for attempted murder. Both this Court and the Alaska Supreme Court have addressed similar issues of statutory interpretation in the past—questions of whether a statute that lists substantive crimes should likewise apply to defendants who attempt to commit one of the listed crimes. Uniformly, we have looked to the purpose behind the legislation when deciding these issues.

For example, in *Mack v. State,* 900 P.2d 1202 (Alaska App.1995), this Court was required to construe AS 12.55.085(f)(1), which forbids sentencing courts from suspending imposition of a defendant's sentence when the defendant "is convicted of a violation of AS 11.41.410—11.41.455". (These listed crimes comprise all the sexual offenses defined by our criminal code.) The question in *Mack* was whether a defendant convicted of *attempting* to commit one of the crimes defined by the listed statutes should be deemed to have been "convicted of a violation of" that statute—meaning that the sentencing court would be prohibited from granting the defendant a suspended imposition of sentence—or, instead, whether such a defendant was ex-

---

**3.** *See* AS 11.41.115(e): "Nothing in [subsection](a) . . . of this [statute] precludes a prosecution for or conviction of manslaughter or any other crime not specifically precluded."

**4.** *See Huitt,* 678 P.2d at 419; *Guertin,* 854 P.2d at 1131.

**5.** *Guertin v. State,* 854 P.2d at 1131. *See also* Wayne R. LaFave & Austin Scott, *Substantive Criminal Law* (1986), § 6.2–(c)(1), Vol. 2, p. 25.

empt from this limitation on the sentencing court's authority.

We explained in *Mack* that, under Alaska law (specifically, our attempt statute, AS 11.31.100(a)), "attempt does not occur in the abstract, but only in connection with a separate, substantive offense[.] ... [A]ttempt cannot be charged alone; a proper charge of attempt must refer not only to the attempt statute but [also] to the underlying substantive offense."[6] So, to resolve the issue of whether the sentencing statute applied to attempts, we examined the history and purpose of the statute. We concluded that the legislature enacted this restriction on a sentencing judge's authority because of "concern over what the legislature perceived to be the repeated and escalating nature of conduct exhibited by many sexual offenders—a pattern of conduct plainly unsuited to the purposes of the suspended imposition of sentence statute".[7] In addition, we noted that construing the disputed statute to exclude attempted sexual offenses "would have anomalous consequences, for it would result in an unconditional bar against the granting of a suspended imposition of sentence in even the least serious [misdemeanor] categories of completed sexual offenses, ... while simultaneously allowing the [suspended impositions of sentence] in more serious attempted [felony] sexual assault cases".[8] Based on these considerations, we construed AS 12.55.085(f)(1) to apply to attempts as well as completed crimes.[9]

The Alaska Supreme Court considered a similar issue of statutory construction in *Brookins v. State*, 600 P.2d 12 (Alaska 1979). In *Brookins*, the statute at issue was former AS 11.15.295, which provided that a person who used or carried a firearm during the commission of a robbery was guilty of an aggravated felony and faced a minimum sentence of 10 years' imprisonment. The issue was whether this statute applied to defendants who were convicted of attempted robbery. The supreme court held that even

though the statute could arguably be interpreted either way, the "public policy against use of a firearm in either an attempted or a completed robbery" led to the conclusion that the statute should apply to attempts.[10]

And, more recently in *Bourdon v. State*, 28 P.3d 319 (Alaska App.2001), this Court held that AS 12.30.040(b)(2)—which denies post-conviction bail to defendants convicted of various sexual offenses listed in the statute—should be construed to deny post-conviction bail to defendants convicted of attempts to commit these crimes. We reasoned that, although the statute does not expressly mention attempts, the legislative history of the statute demonstrated that the legislature was concerned about the dangerousness and the recidivism of sex offenders. We noted that, to be convicted of attempted sexual assault or sexual abuse of a minor, a defendant must have intended to perform the completed crime and must have engaged in a substantial step toward the completion of that crime; thus, a defendant convicted of attempt had shown themself to be equally as dangerous as an offender who completed the crime.[11]

■ Turning now to the question of whether a heat of passion defense is available in prosecutions for attempted murder, we conclude that we should employ an analysis similar to the analysis employed in *Mack, Brookins,* and *Bourdon*. That is, we must construe AS 11.41.115(a) in light of the policy it embodies. The rationale of allowing a heat of passion defense is that a person who commits murder in response to serious provocation is less blameworthy, and assumedly less of a danger to society, than a typical murderer. This same rationale applies equally to a person who attempts (but fails) to kill in response to serious provocation.

Moreover, if the heat of passion defense did not apply to defendants charged with attempted murder, this would create severe and illogical disparities in sentencing. A defendant who, acting in the heat of passion,

---

6. *Mack*, 900 P.2d at 1203.

7. *Id.* at 1204.

8. *Id.*

9. *Id.* at 1205.

10. *Brookins*, 600 P.2d at 17.

11. *Bourdon*, 28 P.3d at 321.

intentionally killed another person would face conviction for manslaughter and a sentence of up to 20 years' imprisonment.[12] But a similarly situated defendant, likewise acting in the heat of passion, who *tried* to kill another person but failed would face conviction for attempted murder and a sentence of up to 99·years' imprisonment.[13] It is inconceivable that, between these two defendants, the legislature intended to impose a five-fold penalty on the unsuccessful assailant.

For these reasons, we conclude that the defense of heat of passion is available in prosecutions for attempted murder.

(Of course, if the defendant succeeds in seriously wounding their victim, then even though the attempted murder charge may ultimately result in a conviction for attempted manslaughter (a class B felony) on account of the defendant's heat of passion, the defendant can still be convicted of first-degree assault (a class A felony)—because heat of passion is a defense only to the specified forms of murder. *See* AS 11.41.115(e).)

*Was Dandova entitled to a jury instruction on heat of passion under the facts of her case?*

■ The major question in this appeal is whether Dandova was entitled to a jury instruction on the defense of heat of passion codified in AS 11.41.115(a). Dandova would have been entitled to a jury instruction on this defense if she presented "some evidence" of the defense. In this context, "some evidence" is a term of art meaning "evidence which, if viewed in the light most favorable to the defendant, is sufficient to allow a reasonable juror to find in the defendant's favor on each element of the defense." [14]

Viewing the evidence discussed above in the light most favorable to Dandova, one might reasonably conclude that Dandova shot Schumacher while in the grip of strong, perhaps overpowering, emotion. Thus, one might say that she acted "in the heat of passion" in a non-technical sense. But the same thing could be said of many people who commit a homicide and are convicted of murder. That is, many murders are committed because the killer is experiencing intense emotion at the time.

■ At common law, overpowering emotion was not sufficient to mitigate a murder to manslaughter unless this emotion stemmed from adequate provocation. Loosely speaking, a provocation was adequate if it was "such as might naturally induce a reasonable [person] in the passion of the moment to lose self-control and commit the act on impulse and without reflection".[15] However, this is only a loose definition—for the common law restricted the types of provocation that were deemed adequate to engender a heat of passion.

One major limitation was that the provocative act had to be unlawful. *See* Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3rd ed.1982), pp. 85–86. Thus, a defendant's observation of their spouse's adultery was deemed sufficient provocation, but not the unfaithfulness of the defendant's betrothed or the defendant's lover. Wayne LaFave and Austin Scott, *Substantive Criminal Law* (1986), § 7.10(b)(5), Vol. 2, p. 259. Similarly, an aggressor who was met with lawful force in self-defense would not be allowed to claim that his victim's use of defensive force aroused a heat of passion in him. *Perkins & Boyce*, pp. 89–90.

Another major limitation was that "provocative words [were] not . . . adequate provoca-

---

**12.** Under AS 12.55.125(c), the maximum penalty for manslaughter (a class A felony) is 20 years' imprisonment.

**13.** Under AS 12.55.125(b), a person convicted of attempted murder faces a maximum penalty of 99 years' imprisonment and a mandatory minimum penalty of 5 years.

**14.** *Lacey v. State*, 54 P.3d 304, 308 (Alaska App. 2002), citing *Ha v. State*, 892 P.2d 184, 190 (Alaska App.1995) (the evidence must be suffi-

cient to establish each element of the proposed defense); *Paul v. State*, 655 P.2d 772, 775 (Alaska App.1982) (the evidence, viewed in the light most favorable to the defendant, must be sufficient to warrant a reasonable juror's finding in the defendant's favor on the proposed defense).

**15.** *LaLonde v. State*, 614 P.2d 808, 810 (Alaska 1980), quoting *Austin v. United States*, 382 F.2d 129, 137 (D.C.Cir.1967).

tion, [no matter how] abusive, aggravating, contemptuous, false, grievous, indecent, insulting, opprobrious, provoking, or scurrilous they [might] be". *Perkins & Boyce*, p. 93. Likewise, insulting gestures were never adequate provocation. *Id.* at 95.

Moreover, the common law required the defendant to conform to the emotional standard of a reasonable person who was subjected to the same provocation: the defendant's overpowering emotion was no defense if a reasonable person's emotions would have cooled by the time the defendant committed the homicide. *Perkins & Boyce*, pp. 99–101; *see also LaFave & Scott*, § 7.10(d), Vol. 2, pp. 265–67.

In addition, the defendant's attack on the victim had to be proportionate to the provocation. *Perkins & Boyce*, p. 86; *LaFave & Scott*, § 7.10(b), Vol. 2, pp. 256–57.

These are the limitations that caused Dandova's trial judge to refuse her request for a jury instruction on heat of passion. In this appeal, Dandova argues that the trial judge construed Alaska's heat of passion defense too narrowly. Specifically, Dandova asserts that even though Schumacher's conduct on the day of the shooting was not, of itself, sufficiently provocative conduct to establish heat of passion, Dandova should have been allowed to base her heat of passion argument on the totality of Schumacher's conduct during the years leading up to the shooting, and on the cumulative effect of this conduct on her emotions.

*(a) Our prior decisions construing AS 11.41.115*

Before Alaska's present criminal code went into effect in January 1980, we had no statutory definition of the heat of passion defense. Thus, Alaska's early decisions on this topic—most notably, the supreme court's decision in *LaLonde v. State*, 614 P.2d 808 (Alaska 1980)—were decided under the common law.[16]

 Now, however, the heat of passion defense is codified in AS 11.41.115. This means that we are no longer at liberty to define the defense as we think best—no longer free to exercise our common-law authority to "adopt the rule [of law] that is most persuasive in light of precedent, reason, and policy".[17] Instead, questions regarding the definition and scope of this defense must be answered by ascertaining the legislature's intent through statutory construction.[18]

In *Martin v. State*, 664 P.2d 612, 616–17 (Alaska App.1983), this Court examined the origins of AS 11.41.115 and concluded that our legislature's purpose was, in large part, to codify the common-law defense of heat of passion. In particular, we concluded that the legislature had purposely rejected the expansive formulation of the defense advocated by the drafters of the Model Penal Code.

Section 210.3 of the Model Penal Code defines a defense called "extreme emotional disturbance" which abandons most of the common-law restrictions on what constitutes adequate provocation. Under the Model Penal Code version of the defense, "a homicide

---

**16.** Although *LaLonde* was decided in 1980 (*i.e.*, after Alaska's current criminal code went into effect), the defendant in *LaLonde* was prosecuted under Alaska's former criminal code. Our former criminal code did not explicitly define the defense of heat of passion or the corresponding crime of voluntary manslaughter. *See Keith v. State*, 612 P.2d 977, 987 (Alaska 1980). Thus, the supreme court was declaring the common law in *LaLonde*.

**17.** *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**18.** *See Brant v. State*, 992 P.2d 590, 592–93 (Alaska App.1999) (Mannheimer, J., concurring):

[T]he supreme court's statement in *Guin v. Ha* that, when a court is required to decide a question of law, the court's "duty is to adopt the rule of law that is most persuasive in light of precedent, policy, and reason" ... is only partially true. The statement applies in full measure when a court must declare the common law. But when a court construes a statute, the court's task is to ascertain and implement the intent of the legislature. In accomplishing this task, the court's primary point of reference is the wording of the statute. When that wording is unclear or ambiguous, a court may be assisted by "precedent, policy, and reason"—as well as by the statute's legislative history and the recognized rules of statutory construction. But a court exceeds its authority if it interprets statutes as it believes the legislature should have meant them.

which would otherwise be murder [is reduced to manslaughter if the homicide was] committed under the influence of [any] extreme mental or emotional disturbance for which there is reasonable explanation or excuse." [19]

Alaska's criminal code was formulated almost two decades after the Model Penal Code was issued in its final form. In addition, the Oregon Criminal Code (one the sources that the authors of our criminal code drew from) contains an extreme emotional disturbance provision similar to the Model Penal Code's recommendation.[20] Yet the drafters of the Alaska Criminal Code looked to the law of Illinois rather than the law of Oregon or the Model Penal Code.[21] They wrote a "heat of passion" statute rather than an "extreme emotional disturbance" defense, and the Alaska Legislature followed their recommendation.

From these facts, we concluded in *Martin* that our legislature was aware of the Model Penal Code's version of the defense and refused to enact it. "[T]he legislature did not intend to make 'extreme emotional disturbance' a defense to murder." [22] Instead, Alaska's heat of passion statute is based on Chapter 38, § 9–2(a) of the Illinois Criminal Code—a provision that (according to its Illinois drafters) was intended to "parallel[ ] the common law".[23]

In addition, this Court has ruled that the common-law requirement of proportionality continues to govern the heat of passion defense codified in AS 11.41.115. That is, the defendant's violent reaction must not be disproportionate to the provocation. *See Roark v. State*, 758 P.2d 644, 647 (Alaska App.1988); *Bell v. State*, 658 P.2d 787, 791 (Alaska App. 1983).

Finally, it is clear from the wording of AS 11.41.115 that our legislature rejected some of the more recent liberalizing trends in the law of heat of passion. For instance, although the common-law rule was that provo-

cation could not be based on words alone, *LaFave & Scott* speaks of "[s]ome cases [holding] that a reasonable man may be provoked upon suddenly being told of his wife's infidelity".[24] Under these cases, "information from a third person that a wife has been unfaithful" has been held to constitute adequate provocation, even though the common law would not deem the provocation adequate unless the defendant actually observed (or reasonably believed he observed) the infidelity.[25] But this expanded view of provocation is obviously inconsistent with AS 11.41.115(f)(2), which expressly states that "hearsay reports of conduct engaged in by the intended victim do not ... constitute serious provocation".

*(b) Dandova's argument that adequate provocation can consist of a series of acts which, viewed separately, are not themselves adequate provocation*

As explained above, Dandova asserted that her violent assault on Schumacher was precipitated by two events: (1) a telephone conversation with her lawyer's paralegal earlier in the day, in which she learned that the superior court's custody investigator was going to recommend that Dandova pay a portion of her son C.D.'s counseling expenses, and (2) Dandova's observation of Schumacher getting out of a new truck—an event that reminded her of the fact that Schumacher had won a default judgement against her and had seized most of her assets by executing on that judgement.

Dandova argued that, even though these two events would seemingly not support a finding of "serious provocation", these events had to be evaluated in light of Dandova's entire history with Schumacher—in particular, the fact that Dandova had reason to suspect that Schumacher had sexually abused their son, and the fact that Schumacher had obtained a judgement against

---

**19.** Model Penal Code § 210.3(b), quoted in *Martin*, 664 P.2d at 616.

**20.** *Martin*, 664 P.2d at 616.

**21.** *See Martin*, 664 P.2d at 617.

**22.** *Id.*, 664 P.2d at 616.

**23.** *Id.*, 664 P.2d at 617.

**24.** *LaFave & Scott*, § 7.10(b)(5), Vol. 2, pp. 259–260.

**25.** *Id.*, § 7.10(b)(6), Vol. 2, p. 260.

Dandova and, by executing on this judgement, had taken most of Dandova's money.

At common law, adequate provocation could exist when a defendant knew or reasonably believed[26] that the victim had sexually assaulted or sexually abused the defendant's spouse or close relative.[27] Thus, when Dandova observed physical evidence suggesting that Schumacher had sexually abused C.D., this might have constituted provocation adequate to mitigate an ensuing homicidal assault on Schumacher.

But, according to Dandova's testimony, this incident had occurred years before. Thus, as a matter of law, Dandova could not rely on this incident as adequate provocation for her act of shooting Schumacher—because any reasonable person would have cooled.

(In the trial court, Dandova's attorney argued that "[even] in reasonable people, when these kinds of things are done to members of your family, the heat of passion never subsides". This argument is clearly inconsistent with the common law and, additionally, it is inconsistent with Alaska cases on this subject, particularly *LaLonde v. State*[28].)

On appeal, Dandova does not claim that her suspicions of sexual abuse constituted adequate provocation for her much later attack on Schumacher. Nor does she assert that Schumacher's lawsuit against her, and his ensuing executions on her assets, constituted adequate provocation. Rather, Dandova attempts to use these events in a different way—as an explanation of why she reacted so violently to her attorney's telephone call

and the sight of Schumacher's new truck on the day of the shooting. Dandova argues that an act which does not itself constitute "serious provocation" within the definition contained in AS 11.41.115(f)(2) can nevertheless be deemed adequate provocation if this act stems from or reminds the defendant of the victim's past wrongs—so that the whole series of interactions between the defendant and the victim, taken as a whole, constitutes "serious provocation".

Dandova relies on *People v. Berry*, 18 Cal.3d 509, 134 Cal.Rptr. 415, 556 P.2d 777 (1976), in which the California court ruled that adequate provocation can arise from a series of provocative acts by the victim. The rationale of the *Berry* decision is that even though the victim's provocative acts, viewed individually, would not be adequate to support a heat of passion defense, a series of provocative acts can constitute adequate provocation if, taken as a whole, they comprise a course of conduct that would engender overwhelming passion in a reasonable person. *Id.* 134 Cal.Rptr. 415, 556 P.2d at 780–81.

Another case adopting a similar rationale, this one from Australia (*Moffa v. The Queen*[29]), is discussed in *Perkins & Boyce:*

> It has been recognized that many factors, possibly not sufficient independently to constitute adequate provocation, may join together and be sufficient to raise an issue of provocation. [For example, it] has been held [that] where a defendant's wife rejected his advances toward reconciliation, de-

---

26. *See Howell v. State*, 917 P.2d 1202, 1208–09 (Alaska App.1996). In *Howell*, this Court concluded that, at common law, the adequacy of the provocation was evaluated under the circumstances as the defendant reasonably perceived them, even if it turned out that the defendant was mistaken. We then held that, because the legislature "inten[ded] to codify the traditional doctrine of heat of passion" in AS 11.41.115, this same common-law doctrine concerning a defendant's reasonable but mistaken belief would continue to apply to cases governed by our heat of passion statute.

27. *See Perkins & Boyce*, p. 97.

28. 614 P.2d 808 (Alaska 1980). In *LaLonde*, the defendant asserted that her decision to kill her former lover was prompted by a report that she heard several hours before—a report that this

former lover was thinking about killing LaLonde's new lover and, perhaps, LaLonde as well. The supreme court held that a reasonable person would have cooled within several hours' time after hearing this report, and thus LaLonde could not rely on heat of passion as a defense to murder. *Id.* at 811.

The issue of whether a reasonable person would cool within a particular span of time will often turn on the particular facts of the case. However, *LaLonde* follows the common law in rejecting the notion that some provocations are so great that a reasonable person would never cool.

29. 51 A.L.J.R. [Australian Law Journal Reports] 403 (High Court of Australia 1977).

nied affection for him, scorned him with racial epithets, stated [that] she had intercourse "with everybody on the street", and threw a telephone and photographs at him, [these] facts justified a [jury] instruction on provocation for common law manslaughter.

*Perkins & Boyce*, p. 97. *See also Commonwealth v. McCusker*, 448 Pa. 382, 292 A.2d 286, 289–290 (1972), and *People v. Bridgehouse*, 47 Cal.2d 406, 303 P.2d 1018 (1956).

In a similar vein, *LaFave & Scott* addresses the related problem of how to determine the "cooling-off period" when the victim engages in a series of provocative acts. As noted in *LaFave & Scott*, "[n]ot infrequently, there is a considerable time interval between the victim's act of provocation and the defendant's fatal conduct—time enough for passion to subside. [Then,] some event occurs which rekindles the defendant's passion." [30] According to *LaFave & Scott*, "if this new occurrence is enough to trigger the passion of a reasonable man, the cooling-off period should start with the new occurrence".

[In the] typical heat-of-passion manslaughter case[,] one specific event (of one of the kinds previously discussed) immediately produces a rage in the defendant. This may account for the fact that modern codes usually state that [the] defendant's passion must be "sudden". However, a more realistic appraisal of how human emotions work compels 'the conclusion—which some courts have reached—that a reasonable provocation can be produced by a series of events occurring over a considerable span of time. When that is the case, then ... the measurement of the cooling time should commence with ... the last provocative event.

*Id.*, § 7.10(d), Vol. 2, p. 267.

*Perkins & Boyce* agrees that a later event can rekindle passion—"that passion may be suddenly revived by circumstances that bring the provocation vividly to mind".[31] However,

*LaFave & Scott* concedes that the court decisions on this topic "have not always recognized" the idea that the cooling-off period should recommence with the most recent provocative act.[32]

We are unsure whether AS 11.41.115 was intended to incorporate Dandova's suggested formulation of "serious provocation". Admittedly, there are some cases to support Dandova's "series of provocations" or "revival of provocation" theory, and this theory has found favor in the two treatises discussed above. On the other hand, as we noted in *Martin v. State*, Alaska's heat of passion statute, AS 11.41.115, was intended to generally codify the common-law definition of adequate provocation—presumably, the definition known to the statute's drafters and to the legislature when it enacted the statute in 1978.[33]

In *Martin*, we addressed—but did not decide—the question of whether "serious provocation" as defined in AS 11.41.115(f)(2) was confined to the categories of provocation deemed adequate at common law—basically, "situations of substantial violence or discovered adultery".[34] This question arose in *Martin* because the defendant in that case shot and killed her lover after learning that he was dissatisfied with their relationship and that he was seeing another woman.

As we described in *Martin*, the defendant "learned that [her lover] was dissatisfied with their relationship over four months prior to the killing"; she learned "approximately thirty days before the killing [that her lover] was seeing another woman"; and, "two weeks before the killing, Martin learned who [this woman was]".[35] At her trial, Martin testified that the event that pushed her over the edge was when she asked her lover "how he expected [the two of] them to get along when he wouldn't have anything to do with her", to which he responded, "I don't want anything to do with you now." Martin said that, upon hearing this response, she went into a fury, obtained a gun from her bedroom, then re-

---

**30.** *LaFave & Scott*, § 7.10(d), Vol. 2, p. 266.

**31.** *Perkins & Boyce*, p. 100.

**32.** *LaFave & Scott*, § 7.10(d), Vol. 2, pp. 266–67.

**33.** *Martin*, 664 P.2d at 617.

**34.** *Id.* at 618.

**35.** *Id.*

turned and shot her lover while he was washing his hands at the sink.[36]

We noted that, during the events that precipitated the homicide, Martin's lover "had not raised his voice", nor had he "threatened Martin, or tried to strike her".[37] All he had done was to verbally affirm what Martin already knew: that he was seeing another woman and that he wished to end their relationship. We concluded that, "[u]nder all these circumstances, ... the trial [judge] properly found that there was insufficient evidence of 'heat of passion' to warrant an instruction on that defense." [38]

The *Martin* opinion is somewhat terse in its explanation of *why* this evidence was insufficient as a matter of law to establish heat of passion. Conceivably, the Court could have been applying the common-law rule that provocation must consist of an unlawful act (since leaving one's lover is not unlawful). However, given the discussion of the facts that precedes the Court's ruling, this interpretation seems unlikely. Instead, the Court was apparently following the statutory definition that insulting words alone can not constitute adequate provocation.

In doing so, the *Martin* court implicitly rejected an argument that is quite similar to the one Dandova makes in this appeal: the argument that the victim's words, while perhaps insufficient by themselves to constitute adequate provocation, can be deemed adequate provocation if they are sufficient to forcefully remind the defendant of the past wrongs that the victim has inflicted on the defendant. Thus, our ruling in *Martin* appears to be contrary to the more flexible definition of provocation that has been adopted by some other jurisdictions.

However, we conclude that we need not resolve this issue in Dandova's case. Even assuming that the definition of "serious provocation" in AS 11.41.115(f)(2) might include provocation that consists of a series of pro-vocative events, Dandova's argument still falters on the facts of her case and on the wording of our statute.

As explained above, Dandova asserted that her act of shooting Schumacher was triggered by two events on the day of the shooting. The first of these events was a telephone call from her attorney's paralegal. In this phone call, the paralegal told Dandova that the superior court's custody investigator had decided to recommend that Dandova pay a portion of her son C.D.'s counseling expenses. Either from something that the paralegal said, or from Dandova's own suspicions concerning Schumacher's motives, Dandova somehow understood—mistakenly—that the custody investigator was making this recommendation because Schumacher had declared that he was too poor to bear the entire expense himself.

There is a major legal impediment to categorizing this telephone conversation as a provocation: AS 11.41.115(f)(2) expressly states that hearsay reports of the victim's conduct do not constitute serious provocation. Thus, even if the paralegal had told Dandova that Schumacher had recently sexually abused C.D., or that newly discovered evidence proved that Schumacher had obtained his civil judgement against Dandova by fraud, these hearsay reports would be insufficient—as a matter of law—to mitigate the seriousness of Dandova's attack on Schumacher.

Obviously, there will be times when hearsay reports of another person's injurious and illegal conduct can engender strong emotions—emotions such as the rage, terror, or wild desperation that can characterize heat of passion.[39] But the definition of the heat of passion defense has always been the product of an uneasy marriage between psychology and social policy. At common law, many provocative events—events that would clear-

---

**36.** *Id.*

**37.** *Id.*

**38.** *Id.*

**39.** *See Howell v. State,* 917 P.2d 1202, 1206 (Alaska App.1996) ("We have consistently recog-

nized that, in the context of the heat of passion statute, the word 'passion' encompasses more than anger or rage; it includes fear, terror and other intense emotions."); *Ha v. State,* 892 P.2d 184, 196 (Alaska App.1995) (same); *LaPierre v. State,* 734 P.2d 997, 1001–02 (Alaska App.1987) (same).

ly tend to engender overwhelming emotion in the hearer or the onlooker—were nevertheless flatly excluded from the definition of "provocation" because the common-law courts believed that it was bad policy to allow a defense to murder based on these types of events.

In Alaska, our defense of heat of passion is now defined by statute, so it is the legislature that makes these policy choices. But when the legislature declares, in AS 11.41.115(f)(2), that "insulting words, insulting gestures, or hearsay reports of conduct engaged in by the intended victim do not, alone or in combination with each other, constitute serious provocation", the legislature is simply continuing the centuries-old practice of placing policy limits on the heat of passion defense, and we must defer to their judgement.

(We note—but do not decide—the possible contention that, even though AS 11.41.115(f)(2) declares that hearsay reports of the victim's conduct do not "alone" constitute serious provocation, the required level of provocation might be established by a hearsay report *in combination with* other acts of provocation—acts other than insulting words or gestures, which the statute specifically precludes. We do not decide this issue because (a) it is not raised and, as we explain in the following paragraphs, (b) Dandova did not present evidence of other acts that qualify as "provocation".)

■■■ The second event that purportedly triggered Dandova's armed assault on Schumacher was her observation that Schumacher had purchased a new truck. Dandova testified that, when she saw Schumacher getting out of this vehicle and walking toward his attorney's office, it reminded her of how Schumacher had obtained a judgement against her and had executed on her assets, so that she was left poor while he could afford a new vehicle.

But, as with the telephone call, there is a major legal impediment to categorizing this event as a provocation. Schumacher was not doing anything to Dandova. He was simply parking his vehicle on the street and walking to an appointment with his attorney. In fact, he was unaware that Dandova was there and was watching him.

Under AS 11.41.115(a), to establish a prima facie case of heat of passion, the defendant must do more than introduce evidence that the killing or attempted killing was done from intense emotion. The defendant must also introduce evidence that their passion "resulted from a serious provocation *by the intended victim*"—that this passion stemmed from the victim's conduct as defined (and limited) by AS 11.41.115(f). But what of the situation where the defendant views the victim's conduct as provocative, and yet the victim is merely going about their life, with no idea that their activities are provocative to the defendant?

We addressed this issue in *Roark v. State,* 758 P.2d 644 (Alaska App.1988), in the context of construing mitigating factor AS 12.55.155(d)(7) (proof that "the victim provoked the [defendant's] crime to a significant degree"). Regarding the legal definition of "provocation" in this context, we said:

> In common usage, "to provoke" means: "1. to excite to some action or feeling 2. to anger, irritate, or annoy 3. to stir up (action or feeling) 4. to call forth; evoke." *Webster's New World Dictionary* (2nd College ed.1980). This definition plainly suggests something more direct and purposive than a mere causal link between the person who provokes a response and the action or feeling that is provoked. When the victim directs actions or words at the defendant for the express purpose of eliciting a response, it is clear that the defendant may be said to have been "provoked". When the victim's conduct is neither directed at the defendant nor intended to influence the defendant's actions or emotions, however, the mere fact that it has the incidental effect of prompting the defendant to react, thereby contributing in a causal sense to the commission of the crime, would not in itself justify a finding of provocation.

*Roark,* 758 P.2d at 647.

Schumacher's conduct of purchasing a new truck, and of parking his vehicle on a public street, unaware that he was within Dandova's view, is the second type of conduct discussed in this passage from *Roark:* it was "neither

directed at [Dandova] nor intended to influence [her] actions or emotions". Even though this event "[had] the incidental effect of prompting [Dandova] to react, thereby contributing in a causal sense to the commission of the crime", it was not "provocation".

We readily acknowledge that the *Roark* definition of provocation is not complete. The law has always recognized some types of conduct as constituting adequate provocation even though the victim's conduct was neither directed toward the defendant nor necessarily *intended* to influence the defendant's emotions. The most obvious example is the victim's act of committing adultery with the defendant's spouse. But adultery was the quintessential provocation at common law—universally recognized as being capable of creating a heat of passion in the other spouse.

Here, the alleged provocative act was Schumacher's purchase of a new truck. We note that this would not constitute adequate provocation at common law—because the common law limited provocation to unlawful conduct, and it is lawful to purchase a vehicle.

We conclude as a matter of law that Schumacher's act of purchasing a new vehicle could not constitute adequate provocation for homicide or attempted homicide under our statute. The purchase of the vehicle was a lawful act, it was not directed at Dandova, and it was not intended to influence her actions or emotions.

 Finally, we turn to another aspect of Dandova's "series of provocations" claim—Schumacher's lawsuit against Dandova, and his subsequent executions against her assets. Dandova argues that this lawsuit, and the fact that her assets were seized to pay the resulting civil judgement, were major factors in creating the intense passion that she experienced on the day that she shot Schumacher. As explained above, the common law required that the victim's provocative act be an unlawful act. Thus, the victim's acts of litigating against the defendant, and of obtaining a judgement against the defendant, and of executing on that judgement, would not be adequate provocation at common law. More recent cases confirm that, as a matter of social policy, courts will not allow defendants to claim heat of passion based on the results of litigation—even when the defendant reasonably believes that the litigation ended in a wrongful or erroneous verdict.

For example, *LaFave & Scott* cites a case from Pennsylvania in which a husband and wife were litigating the husband's support payments. In open court, the judge announced a decision that the husband believed was erroneously favorable to his wife. Upon hearing the judge's decision, the husband shot and killed his wife's attorney, then shot and wounded the judge. The Pennsylvania Supreme Court held that, as a matter of law (*i.e.*, as a matter of social policy), the judge's decision could not constitute an adequate provocation for homicide and attempted homicide.[40]

For similar reasons, we are likewise hesitant to allow Dandova to rely on Schumacher's lawsuit as a provocation for attempted murder.

To summarize: We do not definitively decide whether "serious provocation" can be established by a victim's series of provocative acts. Rather, we hold that even if Alaska law allowed "serious provocation" to be established by a series of provocative acts, Dandova still failed to establish her entitlement to a jury instruction on heat of passion.

 It would be one thing if Dandova had offered a series of acts that each qualified as "provocations", so that the only remaining issue was whether their cumulative effect constituted "serious provocation". But, with the exception of the long-ago allegation that Schumacher had sexually abused their child, Dandova based her heat of passion claim on acts and events that, as a matter of law, do not qualify as "provocations". Thus, we resolve Dandova's case with a narrow ruling: a defendant can not establish "serious provocation" by relying on

---

**40.** *See Commonwealth ex rel. Haines v. Banmiller*, 393 Pa. 439, 143 A.2d 661 (1958), cited in *LaFave & Scott*, § 7.10(b)(8), Vol. 2, p. 261.

the cumulative effect of acts and events which, as a matter of law, do not qualify as "provocations".

### Conclusion

For the reasons stated here, we conclude that the trial judge properly denied Dandova's request to have the jury instructed on heat of passion. The judgement of the superior court is AFFIRMED.

COATS, Chief Judge, dissenting.

I agree with my colleagues that Dandova's heat of passion defense had some significant problems and was very weak. But Dandova was entitled to a jury trial and it was up to the jury to determine whether Dandova established that she acted in the heat of passion.

The Alaska Supreme Court has stated that "any weakness or implausibility in the evidence supporting [a defendant's] story is not a relevant consideration." [1] The legislature's description of when the defendant's conduct is mitigated by heat of passion as codified in AS 11.41.115(a) appears to me to be fairly straight forward. And, of course, the trial court has the discretion to address any lack of clarity by giving supplemental instructions. In my view, the trial court should have instructed the jury on heat of passion and should have let the jury decide whether Dandova acted in the heat of passion.

---

1. *Toomey v. State*, 581 P.2d 1124, 1126 n. 10 (Alaska 1978); *see also Houston v. State*, 602 P.2d 784, 785 (Alaska 1979); *Folger v. State*, 648 P.2d 111, 114 (Alaska App.1982).