Filed 2/26/13  P. v. Antwane CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LORD JULIAN ANTWANE,<br><br>Defendant and Appellant. | B240539<br><br>(Los Angeles County<br>Super. Ct. No. MA053429) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Lisa M. Chung, Judge.  Affirmed.

Landra E. Rosenthal, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stacy S. Schwartz and Kimberly J. Baker-Guillemet, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

A jury convicted defendant Lord Julian Antwane of first degree murder in violation of Penal Code section 187, subdivision (a).[1] The jury found that defendant personally used and discharged a firearm causing death under section 12022.53, subdivisions (b), (c), and (d). The trial court sentenced defendant to a term of 50 years to life, consisting of 25 years to life for the murder and a consecutive 25 years to life for the firearm-use enhancement under section 12022.53.

Defendant appeals on the grounds that; (1) the trial court erred in refusing to instruct the jury regarding voluntary manslaughter; and (2) the court erred by failing to instruct the jury sua sponte that it could consider provocation in determining the degree of murder. Finding no error, we affirm.

**FACTS**

*Prosecution Case*

On the evening of November 1, 2009, defendant and his older brothers Lord Daireek Antwane and Lord Christian Antwane were at a barbecue at the family residence on Colleen Drive in Lancaster. Christian[2] had recently moved from North Carolina to Los Angeles and was visiting his family in Lancaster. Donee Diamond and Michael Cooper were friends with the Antwane brothers and were also at the barbecue. Cooper had known the Antwane brothers since elementary school. He could tell the brothers apart by their facial features and also recognized the differences in their voices.

Cooper, Diamond and the Antwane brothers were drinking beer on the front lawn when Arthur Hicks pulled up in his car and asked for the time. Hicks accepted an invitation to stay and drink with the group. A verbal argument developed between Hicks and Cooper. Christian told Hicks not to use profanity in front of the Antwane brothers'

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     We refer to Lord Christian Antwane and Lord Daireek Antwane by their middle names to avoid confusion, not out of disrespect.

sister who was present. A further argument ensued and Christian and Hicks agreed to fight down the street away from the house.

Hicks drove his car to the end of the street. Christian took his sister inside the house and asked Diamond to speak to Hicks and try to calm him down. Christian brought a gun from North Carolina and had shown it to defendant and Diamond the previous day. The gun was hidden in the backyard of the Antwane residence. Christian asked defendant to "grab the firearm just so we could be protected walking down the street to see if we're okay." Christian, Daireek, Cooper and Diamond walked down the street to meet Hicks.

Diamond and Hicks started fighting and punches were exchanged. Diamond bled profusely from the forehead. Cooper saw defendant run past him holding something in his hand which was concealed by a bag. The bag "flew off" and Cooper saw something metallic in defendant's hand. He then heard gunshots and saw the muzzle flash come from defendant's hand. Christian saw Diamond fall to the ground and heard gunshots coming from where defendant was standing. Christian was aware of where everybody was positioned and did not see Daireek, Diamond, or Cooper shoot Hicks.[3] Hicks was shot six times, including two gunshots to the chest, one of which was fatal.

Carlos Topete lived on Colleen Drive in Lancaster and heard gunshots on the evening of November 1, 2009. He went outside and saw four boys run down the street and enter the house directly across from him. He recognized some of the boys as his neighbors and identified defendant in a photographic line-up and in court as one of the individuals he saw that night.

After the shooting Diamond, Cooper and the Antwane brothers returned to the family residence on Colleen Drive. On the way back Cooper heard Christian and Daireek scream at defendant: "What are you doing? Are you crazy?" He did not hear any

---

[3] Christian testified that when the shooting occurred Diamond and Hicks were standing approximately six to nine feet from him. Daireek was approximately one foot to Christian's right, and Cooper was a couple of feet to his left.

response from defendant. Defendant and Christian left in a Chevy Impala with Diamond driving.[4]

At approximately 8:00 p.m. on November 1, 2009, Deputy Sheriff John Amis of the Lancaster Station responded to a call that shots had been fired and the suspects had left the scene in a white Chevy Impala. Deputy Amis saw the car with three occupants and followed it. The vehicle stopped and defendant ran from the car and jumped over a wall into a residential area near 18th Street and Jackman Street. Defendant was wearing a white jacket. Christian also jumped from the vehicle moments later and ran. Diamond was the lone occupant of the vehicle when he was arrested shortly afterwards.

Los Angeles County Deputy Sherriff Jason Phillippi and his K-9 dog assisted in searching the area for individuals that had run from the vehicle while police were in pursuit. Deputy Phillippi's dog located defendant hiding in a trash can in the backyard of a house. The dog bit defendant and dragged him out of the trash can. Defendant was taken into custody and subsequently treated at Antelope Valley Hospital for his injuries.

Los Angeles County Sherriff's Detective Peter Hecht arrived at the crime scene at approximately 1:00 a.m. on November 2, 2009. He noted the streetlights were working and the area where the shooting occurred was "fairly well lit" and "you can see without the assistance of a flashlight." Detective Hecht observed numerous shell casings and bullet fragments scattered throughout the area. Drops of blood and bloody clothing were also present. In all, detectives and criminalists recovered 31 pieces of physical evidence from the scene of the crime.

Neil Small lived near 18th Street and Jackman Street in November 2009. He found a "wad of clothes" in his backyard that included a white sweatshirt and a black T-shirt. The black T-shirt was wrapped around a .45-caliber semiautomatic Glock Model 30 pistol. Also found was a magazine and two live rounds for the pistol.

---

[4]    Cooper testified that defendant, Diamond and Daireek "sped off" in the car, and he and Christian went inside the residence. Later, he and Christian jumped over the backyard fence and left.

4

Los Angeles County Sheriff's Department Deputy Sheriff Edmund Anderson testified as the prosecutor's firearms identification expert. Sheriff Anderson analyzed the Glock Model 30 .45-caliber semiautomatic pistol, eight fired cartridge cases and five bullet fragments recovered from the scene of the crime, and three fired bullets recovered from the coroner's office removed from Hicks during his autopsy. He opined that all eight of the spent casings were ejected from the .45-caliber Glock pistol recovered from Small's backyard, the bullet fragments had no comparison value, and the three bullets recovered from the coroner's office "could have been fired from that particular Glock."

***Defense Case***

Defendant's father, Christian Antwane, testified on behalf of defendant. Defendant was Antwane's youngest son, Daireek was the middle son, and Christian was his oldest son. He also had a daughter Christine, who was 10 years younger than defendant.

Antwane testified that Christian and defendant were always antagonistic toward one another dating back to their childhood. When defendant was just a baby, Christian would blame him for breaking things in the house. Christian was estranged from the family and blamed defendant. In approximately 2005 or 2006, Christian broke a toilet while having sex with his girlfriend in the bathroom of the family home. Defendant told Antwane about the incident and Christian had to leave the house. Antwane also testified that Christian had sex with defendant's girlfriend. When defendant found out he told Christian's wife, and this caused a fight between Christian and his wife. Antwane testified that there was "intense hatred" between defendant and Christian.

Antwane was familiar with both Cooper and Diamond. He did not consider Cooper to be a truthful person and saw him as a bad influence on his sons. Christian treated Cooper and Diamond more like family than he did defendant and they always came first.

At the time of the shooting on November 1, 2009, Antwane was in a recording studio in his home. He was wearing headphones and did not hear any gunshots. He testified that he learned the details of the shooting at defendant's preliminary hearing.

Prior to that, defendant, Daireek, and Christian denied being in the vicinity of the shooting and claimed they did not know anything about it whenever he asked them. Antwane believed defendant when he denied involvement in the shooting.

Detective Hecht was also called by the defense. Cooper told Detective Hecht that he had been threatened by Christian and warned not to say anything. Diamond did not want to cooperate with law enforcement and had minimal information regarding the incident.

## DISCUSSSION

### I.     Trial Court's Refusal to Instruct on Voluntary Manslaughter

#### A.     *Contention*

Defendant contends the trial court prejudicially erred by failing to instruct the jury on voluntary manslaughter upon sudden quarrel or in the heat of passion as a lesser included offense of murder. Defendant maintains that the record contains sufficient evidence that he acted in response to the adequate provocation of Hicks's offensive behavior.

Defendant and his brothers took offense to how Hicks acted in the presence of their younger sister. He contends that Hicks's behavior was particularly offensive and constituted such provocatory conduct so as to justify an instruction on voluntary manslaughter because defendant acted in the heat of passion.

#### B.     *Proceedings Below*

During the discussion on jury instructions among counsel and the trial court, the trial court stated that it had included an instruction on the lesser included offense of voluntary manslaughter based on the theory of imperfect self-defense of another.[5] The

---

[5]     Pursuant to CALCRIM No. 571, the court instructed in pertinent part, as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect defense of another. [¶] . . . [¶] The defendant acted in imperfect defense of another if: [¶] 1. The defendant actually believed that Donee Diamond was in imminent danger of being killed or suffering great

6

court also explained why it rejected a defense request for an instruction on the effect of voluntary intoxication. The court then asked if either side wished to be heard before final copies of the jury instructions were generated. The prosecutor and defense counsel stated on the record that they did not.

### C. Relevant Authority

"The trial court is charged with instructing upon every theory of the case supported by substantial evidence . . . ." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) Substantial evidence is evidence that is "reasonable, credible and of solid value." (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1165; *People v. Crew* (2003) 31 Cal.4th 822, 835.) Pure speculation does not constitute the requisite substantial evidence sufficient to support a lesser included offense instruction. (*People v. Wilson* (1992) 3 Cal.4th 926, 942.) The failure to instruct on a lesser included offense is reviewed de novo. (*People v. Licas* (2007) 41 Cal.4th 362, 366 ["'We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense'"].)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Voluntary manslaughter is the intentional but nonmalicious killing of a human being. (§ 192; *People v. Manriquez* (2005) 37 Cal.4th 547, 583; *People v. Benavides* (2005) 35 Cal.4th 69, 102.) Voluntary manslaughter is a lesser included offense of murder. (*People v. Manriquez, supra,* at p. 583.) A killing may be reduced from murder to voluntary manslaughter if it occurs upon a sudden quarrel or in the heat of passion on sufficient provocation, or if the defendant kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense. (*Ibid.*)

"A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.]" (*People v. Moye* (2009) 47 Cal.4th 537, 549.) To satisfy the

---

bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be."

objective, or reasonable person, element of heat of passion voluntary manslaughter, the defendant's heat of passion must be attributable to sufficient provocation. (*Ibid.*) "To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.]" (*Id.* at p. 550.) "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201.)

The circumstances giving rise to the heat of passion are also viewed objectively. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 82–83.) A defendant may not set up his own standard of conduct and justify or excuse his acts because his passions were aroused, unless the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable person. (*People v. Manriquez, supra,* 37 Cal.4th at p. 584; *People v. Oropeza, supra,* at pp. 82–83.) "The claim of provocation cannot be based on events for which the defendant is culpably responsible." (*People v. Oropeza, supra,* at p. 83.)

If the trial court fails in its duty to instruct on a lesser included offense supported by the evidence, the error is one of state law alone. (*People v. Breverman* (1998) 19 Cal.4th 142, 165.) It does not require reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome. (*Id.* at p. 178; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

### D. *No Evidence Justified a Voluntary Manslaughter Instruction*

Here, there was no evidence from which the jury could conclude that defendant killed Hicks in a heat of passion or sudden quarrel. Defendant did not exchange any words with Hicks, nor did he engage in any physical confrontation with Hicks prior to shooting him. Nothing in the record supports the instruction and the evidence was strong

8

that defendant committed first degree murder. (*People v. Breverman, supra,* 19 Cal.4th at p. 162.)**[6]**

The sequence of events was simply not one that would cause an ordinary person of average disposition to act in the heat of passion. Hicks did not show up unannounced as defendant contends. He was invited by the Antwane brothers and their friends to join the barbecue and have a drink. In the beginning, an argument developed between Hicks and Cooper. Defendant's brother Christian appeared upset by Hicks's behavior and also argued with him. There was no evidence that defendant was even aware of the dispute that was taking place and likewise no evidence that Hicks provoked a reaction from anyone other than Cooper and Christian.

The incident could not be characterized as a "sudden quarrel" because the evidence showed that Christian and Hicks agreed to engage in a physical confrontation and Hicks got in his car and drove to the end of the street. Diamond, who was sent allegedly by Christian to intervene in the dispute, ended up fighting with Hicks. Nor was there any evidence that Cooper, Christian and Daireek either felt the need, or attempted to intercede in the fight to help their friend Diamond even though they were in close proximity. The evidence showed that defendant retrieved the gun (at Christian's request), and concealed it in a plastic bag before joining the others where Hicks and Diamond were engaged in a physical confrontation.

Defendant claims that due to his strict upbringing, Hicks's use of inappropriate language in the presence of defendant's sister was so egregious as to inflame defendant's passion. This claim is without merit because the yardstick is not how defendant or a member of the Antwane family would react. Defendant is not entitled to set up his own standard of conduct. (*People v. Manriquez, supra,* 37 Cal.4th at p. 584 [defendant cannot create an unreasonably heightened sense of injustice in order to justify his conduct].) Here, not only were the facts and circumstances insufficient to arouse the passions of the

---

**[6]** We note defendant's defense that he was not the person who shot Hicks, "Lord Julian Antwane did not murder Arthur Hicks" and "Lord Julian wasn't the shooter" effectively rejected any voluntary manslaughter theory.

ordinarily reasonable person, they were insufficient to provoke defendant's two brothers. Furthermore, the desire for revenge does not qualify as a passion that will reduce a killing to manslaughter. (*People v. Bufarale* (1961) 193 Cal.App.2d 551, 562.)

Although no specific type of provocation is required (*People v. Berry* (1976) 18 Cal.3d 509, 515), the court may resolve the question when the provocation is so slight or so severe that reasonable jurors could not differ on the issue of adequacy. (*People v. Brooks* (1986) 185 Cal.App.3d 687, 693.)

In *People v. Fenenbock* (1996) 46 Cal.App.4th 1688 (*Fenenbock*), the evidence showed a group of people planned to punish the victim for an alleged child molestation, and a couple of days later a number of those in the group grabbed him and savagely killed him. Fenenbock's testimony was that he did not learn about the molestation claim until the day of the killing; although he admitted hitting the victim, he denied participating in the murder, testifying he calmed one of the other assailants down and then left the area. (*Id.* at pp. 1692–1702.) The trial court refused to instruct on any crimes less than first degree murder. Fenenbock argued the trial court should have instructed on provocation, as it pertained to second degree murder *and* to voluntary manslaughter. The court rejected the claims. The allegedly abused child was not a relative of Fenenbock, there was no evidence that he had any close personal bond with the child or her parents, and the child had not been visibly injured. The court found no evidence from which a jury could have found provocation so serious that it would produce a lethal response in a reasonable person.

In previous cases, the murder of a family member (*People v. Brooks, supra,* 185 Cal.App.3d 687), a sudden and violent quarrel (*People v. Elmore* (1914) 167 Cal. 205, 211), and infidelity of a wife (*People v. Berry, supra,* 18 Cal.3d 509) or paramour (*People v. Borchers* (1958) 50 Cal.2d 321) have been held to constitute legally adequate provocation for voluntary manslaughter. But here, as in *Fenenbock,* the circumstances did not constitute provocation sufficient to reduce the killing to manslaughter. Hicks allegedly used inappropriate language which was not directed at defendant. There was an agreement to resolve the issue in a physical fight not involving defendant. In sum, the

10

circumstances here did not constitute "sufficient provocation" to warrant defendant's disproportionate reaction of firing eight shots, six of which struck Hicks inflicting one fatal wound. (*People v. Moye, supra,* 47 Cal.4th at p. 549.)

## II.    Court's Failure to Sua Sponte Give CALCRIM No. 522

Defendant contends the trial court erred in failing to instruct sua sponte with CALCRIM No. 522 on provocation that reduces the degree of murder from first to second degree.[7] We reject this contention.

"A pinpoint instruction 'relate[s] particular facts to a legal issue in the case or "pinpoint[s]" the crux of a defendant's case, such as mistaken identification or alibi.'" (*People v. Ward* (2005) 36 Cal.4th 186, 214 (*Ward*), quoting *People v. Saille* (1991) 54 Cal.3d 1103, 1119.)  Although a trial court is required to give a pinpoint instruction on a defense theory upon request when there is evidence supportive of that theory, it is not required to give a pinpoint instruction on the court's own motion. (*People v. Rogers* (2006) 39 Cal.4th 826, 878–879 (*Rogers*); *People v. Saille, supra,* at p. 1119.)

As defendant acknowledges, the California Supreme Court has held that CALJIC No. 8.73 is a pinpoint instruction. (*Rogers, supra,* 39 Cal.4th at p. 878; see also *Ward, supra,* 36 Cal.4th at p. 214; *People v. Mayfield* (1997) 14 Cal.4th 668, 778.)  CALCRIM No. 522, which is the CALCRIM analogue to CALJIC No. 8.73, is also a pinpoint instruction. (*Rogers, supra,* at p. 879; see also bench notes to CALCRIM No. 522.)

Accordingly, we conclude the court did not err in failing to sua sponte give CALCRIM No. 522 as defendant did not request such an instruction.

---

**7**    CALCRIM No. 522 reads:  "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter].  The weight and significance of the provocation, if any, are for you to decide.  [¶]  If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]  [¶]  [Provocation does not apply to a prosecution under a theory of felony murder.]"

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, P. J.

BOREN

We concur:


_____, J.

ASHMANN-GERST


_____, J. *

FERNS

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.